[Crim. No. 17899. In Bank. Apr. 21, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD ALCAREZ GIMINEZ, Defendant and Appellant.

## COUNSEL

Robert N. Chargin, Public Defender, and Ann M. Chargin, Assistant Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Jack R. Winkler, Chief Assistant Attorneys General, William E. James, Assistant Attorney General, Arnold O. Overoye, Joel Carey, James T. McNally and Eddie T. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BURKE, J.**[*]—Defendant was convicted of narcotics possession (former Health & Saf. Code, § 11500). After defendant refused to accept the conditions of a five-year period of probation, the trial court imposed a prison sentence and directed that it commence upon completion of the term defendant was currently serving for another drug conviction.[1] On appeal, defendant now contends that to so impose a consecutive sentence, after having offered him probation, constituted an abuse of the trial court's discretion. In light of the defendant's lengthy history of narcotics abuse and anti-social behavior we do not believe that the trial

---

[*]Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

[1]The trial court was acting under its power of consecutive sentencing set forth in section 669 of the Penal Code. That section provides in pertinent part: "When any person is convicted of two or more crimes, whether in the same proceeding or court or in different proceedings or courts, and whether by judgment rendered by the same judge or by different judges, the second or other subsequent judgment shall direct whether the terms of imprisonment or any of them to which he is sentenced shall run concurrently, or whether the imprisonment to which he is or has been sentenced upon the second or other subsequent conviction shall commence at the termination of the first term of imprisonment to which he has been sentenced, or at the termination of the second or subsequent term of imprisonment to which he has been sentenced, as the case may be . . . ."

court acted arbitrarily or unreasonably. We therefore have concluded that imposition of a consecutive sentence was not improper.

Defendant was arrested in San Joaquin County for narcotics possession in April 1972. In July he appeared before the court and entered a plea of guilty. Criminal proceedings were then suspended in order to determine whether defendant was a narcotics addict. In October 1972 the court so found and defendant was committed to the California Rehabilitation Center for treatment. The following June defendant's commitment to that institution was cancelled[2] and he was returned to the San Joaquin County Superior Court for resumption of criminal proceedings and pronouncement of judgment. At that time the trial judge stated that he was prepared to grant a five-year unsupervised probation upon various conditions, one of which was that defendant waive "the right of the service of a search warrant in search and seizure at any time of the day or night."[3] Defendant refused, however, to submit to the search condition and stated that he would prefer a prison sentence. Thereafter the trial judge, defendant, prosecutor and defense counsel discussed the matter in open court. During the discussion the trial judge made clear that if defendant refused to accept the terms and conditions of probation, a prison sentence would be imposed and made to run consecutively with the term defendant was currently serving.[4] Defendant again refused conditional probation and the trial judge then proceeded to impose a consecutive sentence for the term prescribed by law.[5] Defendant now contends that imposition of a consecutive sentence under these circumstances constituted an abuse of discretion.

■ It is well established that a trial court has discretion to determine whether several sentences are to run concurrently or consecutively. (Pen. Code, § 669; *In re Sandel,* 64 Cal.2d 412, 416 [50 Cal.Rptr. 462, 412 P.2d

---

[2]A month after his San Joaquin County arrest, while on bail, defendant was arrested in Sacramento County for possessing dangerous drugs (former Health & Saf. Code, § 11910.) After his commitment to the California Rehabilitation Center, defendant was convicted of this second drug offense and sentenced by the Sacramento County Superior Court to state prison for from six months to ten years. It was this prison sentence which resulted in the cancellation of his C.R.C. commitment and the resumption of the San Joaquin County criminal proceedings which are the subject of this appeal.

[3]Such a search provision may properly be imposed as a condition to probation where the defendant is a narcotics offender. (*People* v. *Mason,* 5 Cal.3d 759 [97 Cal.Rptr. 302, 488 P.2d 630].)

[4]As noted in footnote 2, *ante,* defendant had been committed to state prison by the Sacramento County Superior Court for another drug offense.

[5]Former Health and Safety Code section 11500 provided for an indeterminate sentence of not less than two nor more than ten years.

806].) ■ It is also the rule that appellate courts do not have the power to modify a sentence or reduce the punishment therein imposed absent error in the proceedings. (*People* v. *Odle,* 37 Cal.2d 52, 57 [230 P.2d 345].) Moreover, such error cannot be predicated on a trial court's determination that several sentences are to run consecutively unless an abuse of discretion is clearly shown. (*People* v. *Morris,* 20 Cal.App.3d 659, 666 [97 Cal.Rptr. 817]; *People* v. *White,* 100 Cal.App.2d 836, 839-840 [224 P.2d 868].)

The concept of judicial discretion is difficult to define with precision. In the past we have described it as "the sound judgment of the court, to be exercised according to the rules of law." (*Lent* v. *Tillson,* 72 Cal. 404, 422 [14 P. 71].) More recently we have said (quoting from another case) that the term judicial discretion "implies absence of arbitrary determination, capricious disposition or whimsical thinking." (*In re Cortez,* 6 Cal.3d 78, 85 [98 Cal.Rptr. 307, 490 P.2d 819].) Moreover, discretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered. (*People* v. *Russel,* 69 Cal.2d 187, 194 [70 Cal.Rptr. 210, 443 P.2d 794]; *People* v. *Fusaro,* 18 Cal.App.3d 877, 894 [96 Cal.Rptr. 368] [cert. den., 407 U.S. 912 (32 L.Ed.2d 686, 92 S.Ct. 2445)].) ■ However, in the absence of a clear showing that its sentencing decision was arbitrary or irrational, a trial court should be presumed to have acted to achieve legitimate sentencing objectives and, accordingly, its discretionary determination to impose consecutive sentences ought not be set aside on review.

■ Turning to the facts of the instant case, we cannot say that the trial court has abused its discretion. As pointed out above, defendant has a lengthy history of narcotics use and anti-social behavior. The probation officer reported that defendant had been named in 15 "writeups" related to narcotics and had suffered 2 felony narcotics convictions. One of these convictions was for a violation which occurred while defendant was on bail. The probation report concluded that defendant needed time "to be dried out" and consequently recommended against probation.

Defendant argues that notwithstanding his prior record, the trial court's decision to impose consecutive sentences must be viewed as an unreasonable and vindictive reaction to defendant's rejection of conditional probation. He contends that the alternatives of probation or consecutive ten-year maximum sentences could not both be appropriate for any one offender and therefore that the trial court's order was essentially arbitrary and not an exercise of discriminating judgment.

Defendant's reasoning is not persuasive. By initially imposing the search condition as a term of probation, the trial judge demonstrated his belief that defendant should be subject to some substantial control for at least five years. Such a search condition would assist in deterring or discovering subsequent narcotics offenses thereby aiding defendant's rehabilitation and providing protection for the public. (*People* v. *Mason, supra,* 5 Cal.3d 759, 764.) The trial judge could have reasonably concluded that defendant's rejection of the search condition was an indication of both an unwillingness to reform and a desire to return to narcotics use at the earliest opportunity. Under these circumstances, the trial judge may well have felt that a two-year parole ineligibility period (made mandatory by Pen. Code, § 3043 upon the imposition of two or more consecutive sentences; not restricted to narcotic offenses) was necessary to further the legitimate sentencing objectives of rehabilitation and protection of the public. In light of the broad discretion to be afforded trial judges both in sentencing and in granting or denying probation and given defendant's extensive criminal record, it does not appear that the imposition of consecutive sentences in the instant case exceeded the bounds of reason.

The judgment is affirmed.

Wright, C. J., McComb, J., Sullivan, J., and Clark, J., concurred.

**TOBRINER, J.**—I dissent on the ground that the imposition of a consecutive sentence by the trial court, under the facts of this case, constitutes an abuse of discretion. As explained in the opinion prepared by Justice Friedman for the Court of Appeal: "The trial court's initial and ultimate sentencing choices moved from an extreme of lenience to an extreme of severity, from unsupervised liberty to a deferred imprisonment creating a possibility of a total of 20 years of incarceration and supervised parole. [Fn. omitted.] When each of these extremes is viewed as a means of achieving the goals of criminal sentencing, both could not be 'right' for any one offender. Without adding to the extensive literature on sentencing objectives, we need consider only the objective of protecting the public against the offender's future criminal conduct. Necessarily implied in the judge's resort to unsupervised probation was a finding that public protection demanded no imprisonment or supervision after completion of the indeterminate Sacramento sentence. Necessarily implied in the judge's alternative selection was a finding that public protection required 2 to 10 years of imprisonment and supervision additional to the Sacramento sentence. If the goal of public protection

was satisfied by an order for unsupervised probation, the consecutive prison sentence was harsh and excessive. If the same criterion justified lengthy imprisonment, it utterly vitiated unsupervised probation. No logically relevant sentencing criteria could simultaneously justify both extremes; hence the choice between them had to be personal, subjective and arbitrary.

"A variety of intermediate alternatives were available. Here, however, we review only the exercise of statutory discretion under section 669 and do not engage in general review of sentence suitability. According to the courtroom dialogue, defendant's rejection of exposure to police search as a condition of probation led the judge to impose a prison sentence. If a sentence concurrent with the existing Sacramento sentence represented a relatively far cry from the judge's initial proposal, it had at least the virtue of greater proximity to it. A concurrent sentence would permit 2 to 10 years in prison and on supervised parole. The judge rejected it and chose the most extreme and most severe alternative available to him. The court's selection of the most severe available alternative was not based upon sentencing criteria; rather, it was an expression of the judge's subjective reaction to defendant's rejection of probation. The turn from one alternative to another was essentially arbitrary and not an exercise of discriminating judgment within the bounds of reason."

The majority do not question Justice Friedman's charge that defendant is being punished primarily not for his crime but for his rejection of the condition of probation. Instead, they seek to justify the expression of the judge's antagonistic reaction on the theory that he could conclude from defendant's rejection of the probation condition both an unwillingness to reform and a desire to return to narcotics use.

Thus the majority infer from defendant's refusal to waive his rights under the Fourth Amendment that defendant seeks to conceal criminal activity. I had thought it settled that a court could never draw an inference of criminal conduct from a defendant's assertion of his constitutional right. (See *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].) Indeed we have consistently held that a police officer may not infer from a defendant's refusal to consent to a search that the defendant is concealing evidence of criminal activity. (*People* v. *Wetzel* (1974) 11 Cal.3d 104, 109-110 [113 Cal.Rptr. 32, 520 P.2d 416]; *People* v. *Cressey* (1970) 2 Cal.3d 836, 841, fn. 6 [87 Cal.Rptr. 699, 471 P.2d 19]; *People* v. *Shelton* (1964) 60 Cal.2d 740, 747 [36 Cal.Rptr. 433, 388 P.2d 665]; *Tompkins* v. *Superior Court* (1963) 59

Cal.2d 65, 68 [27 Cal.Rptr. 889, 378 P.2d 113].) Yet the majority would permit the trial judge to draw this same unconstitutional inference.

Defendant was asked to consent to unannounced, unreasonable and unwarranted searches, at any hour of the day or night, for a period of five years. If defendant prefers to face imprisonment before he will consent to arbitrary government intrusion upon his privacy, such is his constitutional right. A court may not make that preference a basis for inferring that defendant seeks to conceal criminal activity, or a ground for imposing an arbitrary sentence.

**MOSK, J.**—I dissent.

Under existing law it is unquestionably the right of the trial court to exercise discretion in sentencing a defendant. And, as the majority correctly state, appellate courts presently have limited power to interfere with the sentence imposed by a trial judge who has exercised his discretion, absent an abuse of that discretion.

The problem in this case is that the record does not reveal the trial judge meaningfully reflected upon the several available sanctions, and by a process of eliminating less drastic alternatives, ultimately settled upon the severe prison sentence inflicted upon this defendant. The judge may well have carefully cerebrated, but I suggest that appeals such as that involved here would be avoided, or more readily resolved, if the consideration given the sentencing process were recounted in open court for the understanding of the defendant and for perpetuation in the record of the case.[1]

Prison sentences to run seriatim are the most draconian weapon in the trial judge's arsenal. The record discloses they were imposed almost casually in this instance. Yet the American Bar Association, after an exhaustive study of several years' duration, concluded, inter alia, that the "sentence imposed in each case should call for the minimum amount of custody or confinement which is consistent with the protection of the public, the gravity of the offense and the rehabilitative needs of the defendant." (ABA Project on Min. Standards for Crim. Justice, Standards Relating to Sentencing Alternatives and Procedures (Approved

---

[1]The judge apparently believed he was being magnanimous in informing the defendant of the proposed sentence. At one point in the colloquy, he stated: "At least I am telling you what I propose to do. Perhaps I should not tell you anything and go ahead and do it."

Draft 1968) § 2.2.) To apply the American Bar standard, a judge who determines consecutive prison sentences to be necessary for a defendant before him should be expected to explain why such sentences are the minimum amount of custody consistent with public safety, the nature of the crime and the rehabilitative potential of the defendant.

Admittedly this defendant is, by virtue of his frequent involvement with narcotics, an unsympathetic figure. Yet the first impulse of the judge was to give him straight probation; his ultimate order was consecutive state prison terms. Such disparate sentencing options are not uncommon to our penal code. Consider, for example, a defendant convicted of a first offense of second degree burglary. The judge may invoke any of the following sentencing devices in ascending order: (1) summary probation (Pen. Code, § 1203); (2) probation upon various nonpenal conditions; (3) probation with a fine as a condition thereof (Pen. Code, § 1205); (4) probation with time in the county jail as a condition; (5) imprisonment in the county jail up to one year; (6) imprisonment in the state prison not less than 1 or more than 15 years (Pen. Code, § 461). With such diverse sentences available, how can a reviewing court ascertain whether there has been an abuse of discretion if the trial judge merely intones the sentence selected without any explanation on the record as to why, in the exercise of his discretion, he rejected all the lesser alternatives?

Imprisonment is the maximum intrusion by society on an individual's liberty. Unfortunately under some circumstances it is required. Professor Herbert Packer, in writing of "the inevitability . . . of punishment," stated that "In our present state of comparative ignorance about the sources and control of human conduct there is no escape from the use of punishment (whether criminal or not) as a device for reducing the incidence of behavior that we consider antisocial." (Packer, The Limits of the Criminal Sanction (1968) p. 249.) While that is undoubtedly true, the history of crime control and penal methods should warn us that complacent conclusions about inevitability and the assumption that no alternatives exist have in the past all too often been taken to justify barbarity and inhumanity. (Zimring & Hawkins, Deterrence (1973) p. 41.)

While society looks to imprisonment as a source of protection, the record of prisons in solving or curbing the problem of crime is dismal. And, sad to relate, progress in prison techniques over the past century has been negligible. Shortly after World War I George Bernard Shaw wrote that "Imprisonment as it exists today is a worse crime than any of

those committed by its victims." (Shaw, The Crime of Imprisonment, p. 13.) At mid-century two of the nation's most scholarly wardens, both Californians, warned us of their deep concern. Conditions at San Quentin were described by Warden Clinton T. Duffy as a "nightmare" (Duffy, The San Quentin Story (1950) p. 107), and Warden Kenyon J. Scudder declared we should use "prisons as a last resort" because, he wrote, "Most men come out of these prisons worse than when they entered." (Scudder, Prisoners Are People (1952) p. 227.)

The lesson is still unlearned today. Tom Wicker, one of America's most distinguished journalists, wrote in his chronicle of the recent Attica prison revolt: "Caging men as a means of dealing with the problem of crime is a modern refinement of man's ancient and limitless inhumanity, as well as his vast capacity for self-delusion." The 19th century penitentiary produced "more mental breakdowns, suicides and deaths than repentance." It is a melancholy fact that "the nineteenth century reaches nearly to the twenty-first in its long and baleful influence on the treatment of offenders in America and in its legacy of self-delusion—the ingrained American idea that society can make better men and women by sending them to prison, by putting them in cages. However idealistic its origins, that delusion has produced a protracted record of senselessness, futility, dishonor and inhumanity." (Wicker, A Time to Die (1975) pp. 59-62.)

There are few if any criminologists who do not believe that prisons breed, rather than curb, crime. It is not merely the antiquated penitentiary structures, but the tension, hostility, anger, homosexuality and violence necessarily indigenous to a way of life in which men are isolated from society, stripped of all dignity, privacy and status. "The idea of punishment as the law interprets it seems to be," concludes Dr. Karl Menninger, "that inasmuch as a man has offended society, society must officially offend him." (Menninger, The Crime of Punishment (1968) p. 71.)

In this context a collision of basic values is inevitable. On the one hand society demands protection from those who trespass upon its peace and security. On the other hand every individual, even a confirmed malefactor, has certain rights in a constitutional order. Use of the doctrine of "the least drastic alternative" is the best technique for the adjustment of such impact. Its rational application preserves both of the conflicting values: the needs of society and the integrity of the constitutional order.

The doctrine of the least drastic alternative requires that the state—in this instance the sentencing judge—demonstrate a particular course to be the least drastic method of achieving a desired end. Professor Norval Morris calls it "parsimony." He wrote, "The least restrictive—least punitive—sanction necessary to achieve defined social purposes should be chosen." (Morris, The Future of Imprisonment (1974) pp. 60-61.)

The United States Supreme Court has often used the phrase "less drastic means" in a First Amendment context. (*United States* v. *Robel* (1967) 389 U.S. 258, 268 [19 L.Ed.2d 508, 516-517, 88 S.Ct. 419]; *Shelton* v. *Tucker* (1960) 364 U.S. 479, 488 [5 L.Ed.2d 231, 237-238, 81 S.Ct. 247]; Wormuth & Mirkin, *The Doctrine of the Reasonable Alternative* (1964) 9 Utah L. Rev. 254, 267-293; Note (1969) 78 Yale L.J. 464.) The high court used the same expression in *Shapiro* v. *Thompson* (1969) 394 U.S. 618, 637 [22 L.Ed.2d 600, 616-617, 89 S.Ct. 1322], and then spoke of methods that are "necessary" in *Dunn* v. *Blumstein* (1972) 405 U.S. 330, 342 [31 L.Ed.2d 274, 284, 92 S.Ct. 995]. Whatever the precise term adopted, the import of the several formulations is the same: the state must demonstrate that the infringement upon human liberties which occurs is unavoidable if the purpose of the state is to be achieved. (Singer, *The Least Drastic Alternative* (1972) 58 Cornell L.Rev. 51, 56.)

If the purpose of a one-year residency requirement for welfare is to avoid welfare fraud, the Supreme Court found in *Shapiro* v. *Thompson, supra,* 394 U.S. at page 637 [22 L.Ed.2d at pages 616-617], that the waiting period was too drastic and must be invalidated since the state may achieve its interest in a less onerous manner. If the purpose of a year's residence requirement for voting is to assure that the voter has an interest in the election outcome, that requirement is also too drastic since the state may ascertain in other ways that the voter is a bona fide member of the community. (*Dunn* v. *Blumstein, supra,* 405 U.S. at p. 352 [31 L.Ed.2d at pp. 289-290].) If the state wishes to determine the competence of its teachers, it cannot do so by requiring them to list all organizations to which they belong, since investigation of their competence in the classroom would be a more direct and less intrusive method of reaching the same end. (*Shelton* v. *Tucker, supra,* 364 U.S. 479.)

While the least drastic alternative test has not yet been ordered in criminal cases, an emerging case law and commentary supports the principle. It would seem that if the doctrine applies to losses of welfare benefits, voting rights and teachers' tenure, a fortiori it would be relevant to loss of liberty.

In *Covington* v. *Harris* (D.C.Cir. 1969) 419 F.2d 617 [136 App.D.C. 35], a commitment case, the Court of Appeals for the District of Columbia Circuit applied an aspect of the doctrine by requiring the state to demonstrate that less severe confinement was not justified. Chief Judge Bazelon wrote that "[B]efore a court can determine that the hospital's decision to confine a patient in a maximum security ward is, within its broad discretion, 'permissible and reasonable' . . . it must be able to conclude that the hospital has considered and found inadequate all relevant alternative dispositions . . . ." (*Id.* at p. 624.)

A significant federal case in this area is *United States* v. *Waters* (D.C.Cir. 1970) 437 F.2d 722 [141 App.D.C. 289]. In *Waters,* a young offender was eligible for sentencing under the federal Youth Corrections Act, which specifies that the purpose of that act is rehabilitation. He was instead sentenced by the trial court as an adult felon. On appeal the District of Columbia Circuit Court of Appeals declared that trial courts must in the future specify the reasons for not sentencing an otherwise eligible offender under the Youth Corrections Act. In effect, the court held that there was a presumption in favor of sentencing young offenders under the act and that the state, in this case the judge, bore the burden of demonstrating that such a rehabilitative sentence was not justified on the facts of the record.

Again in *United States* v. *Alsbrook* (D.D.C. 1971) 336 F.Supp. 973, a district court panel held that failure to sentence youthful offenders to Lorton Youth Center in Virginia on the sole basis that Lorton was overcrowded was an invalid exercise of sentencing power. Instead of approving a more drastic sentence, the court ordered the immediate relief of the overcrowded situation at that institution. The court spoke in terms of the need for rehabilitation and declared that "[t]he Constitution, the Youth Corrections Act, and the conscience of a civilized society require that youth offenders receive firm but effective opportunity for treatment and realistic rehabilitation." The reference to the Constitution and to the "conscience of a civilized society" suggests possible future application of the Eighth Amendment. (See also *Robinson* v. *California* (1962) 370 U.S. 660 [8 L.Ed.2d 758, 82 S.Ct. 1417]; *Ralph* v. *Warden* (4th Cir. 1971) 438 F.2d 786; *Fulwood* v. *Clemmer* (D.D.C. 1962) 206 F.Supp. 370.)

It appears inevitable to me that courts ultimately will adopt, in one form or another, the doctrine of the least drastic alternative. The doctrine is hardly extreme. The American Law Institute has recommended a

presumption in favor of probation for every offender. (Model Pen. Code (1962) § 7.01.) The American Bar Association has declared that nonconfinement is to be preferred over total or partial confinement "in the absence of affirmative reasons to the contrary." (ABA Sentencing Alternatives and Procedures, *supra*, § 2.3(c).) In a comment related to its conclusion, the American Bar Association said it "believes that the starting point for every sentence should be probation or some other sentence not involving commitment or confinement, and that the extent to which commitment or confinement is employed in a given case should turn on the appearance of specific reasons which seem to call for that disposition." (*Id.* at p. 72.)

Most conscientious trial judges anguish over the sentencing process. It is undoubtedly their least gratifying responsibility. Nevertheless what has been characterized as appellate *laissez faire* may have been misinterpreted by the trial bench as total freedom from accountability. The growing disenchantment with current methods of punition portend more, not less, responsibility on the shoulders of the sentencing judge. A concomitant of that responsibility is the obligation to forthrightly explain its exercise.

In my criticism of current sentencing procedures in California, I do not suggest our state lags behind other jurisdictions. Quite the contrary: California has generally blazed a trail in providing such protective devices as presentence reports, availability of the report to defendant and his counsel, and an opportunity for defendant to be heard at the time of sentencing. But the trail still falls far short of a salutary penological goal, i.e., to assure that the judge not only adequately reflects upon the sentence imposed but demonstrates on the record that he has done so. In short the record must affirmatively reveal that the judge has considered all other less drastic alternative sentences before concluding that which he elects to impose is most appropriate.

Sentencing today is an archaic process at best. By application of the rule of the least drastic alternative we can ameliorate somewhat the most flagrant abuses of the sentencing process by requiring the state, functioning through its trial judge, to articulate the rationale for the sentence imposed. If we cannot abolish prisons, as seems clear, we should in good conscience limit their use to the confinement of those errant members of society for whom no other alternative appears feasible.

If the judge employed his discretion in that manner in the instant case, it does not appear from the record. I would send the matter back to the trial court for reconsideration.

Appellant's petition for a rehearing was denied May 21, 1975. Richardson, J., did not participate therein. Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.