[Crim. No. 20778. First Dist., Div. Two. Apr. 22, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH WILLIAM AXTELL, Defendant and Appellant.

■■■■■

**COUNSEL**

Nolan, Constantinides & Parnes, Thomas J. Nolan, B. E. Bergesen III and Paul N. Halvonik for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Robert R. Granucci and Ronald A. Bass, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**TAYLOR, P. J.**—On this appeal from a judgment of conviction entered after defendant, J. W. Axtell, entered a nolo plea to one count of kidnaping for robbery (Pen. Code, § 209, subd. (b)), the only question is whether the trial court abused its discretion and deprived him of due process by sentencing him to prison. For the reasons set forth below, we have concluded that the judgment must be affirmed.

Although defendant does not challenge either the underlying conviction or his plea, a detailed statement of the pertinent facts is useful for our determination of the issues raised.

About 9:30 a.m. on the morning of Sunday, August 5, 1979, defendant knocked and was admitted to the home of Mr. and Mrs. Mills in South San Francisco. When Mrs. Mills answered the door, defendant asked to speak to her husband. After both returned, defendant took a sawed-off shotgun from under his coat and ordered the Mills to awaken their two teenage daughters. Defendant held all four captive until the codefendant Haggard arrived.

Defendant then told Mr. Mills (who was manager of the Bank of America branch in San Bruno) that he needed money and wanted Mills to open the bank vault so defendant could rob it; while defendant and Mills went to the bank, Mills' wife and daughters would be moved to a different location. Defendant indicated that if anything went wrong, they would be killed; if all went well and everyone cooperated, no one would be harmed.

J. Tolson, a family friend from San Diego, arrived unexpectedly and was also taken hostage. Haggard held Tolson, Mrs. Mills and her daughters[1] at gunpoint while defendant and Mr. Mills proceeded to the bank. Defendant instructed Mills to blink his car lights as they were under continued observation. From the bank, Mills called two of his employees: Ms. Pasdera who had the key to turn off the alarm; Ms. Zerrilla who had the second half of the vault combination. After both arrived, Mills ordered them to open the vault. Defendant said: "This is exciting. I've never seen a vault opened before." Mills, in response to a visit from a San Bruno police officer, indicated that nothing was wrong, as defendant instructed. When Ms. Pasdera and Zerrilla began to fill the suitcase with $1 bills, defendant objected and indicated that he wanted $50 or $100 bills. Seventy-one thousand dollars was put into a suitcase and Ms. Pasdera and Ms. Zerrilla were forced to accompany defendant and Mills to the Mills home.

Defendant and Haggard then tied up and gagged the Mills family, Tolson and the bank employees. Their hands were tied together and all were tied in a circle around a pole in the living room and the stereo turned up to a loud volume. One of the Mills daughters provided the

---

[1]The daughters were tied up but then untied.

telephone number of a neighbor so that defendant and Haggard could telephone instructions to free all of the hostages. After a third confederate failed to arrive to pick them up, defendant and Haggard took the keys to Tolson's van and left in the van with the suitcase and the weapon.

The Mills, however, succeeded in untying themselves a few minutes later and telephoned the police about 2:23 p.m. The police quickly spotted the van in downtown Redwood City. After a high speed chase, the van was rammed by two police cars. Defendant fled over a fence and into the home of P. J. deKulp and his family. Defendant threatened no one in the deKulp home and surrendered after police had surrounded it. Subsequently, defendant confessed his role in the crimes.

In return for defendant's nolo plea to count one for kidnaping with robbery, the remaining nine counts of the information were dismissed.

The probation report indicated that at the time of the offense, defendant was 22 years old. He had been "reared in a decent, stable, and well-respected family home," raised in the small community of Newton, Iowa, where his parents still resided. Over 130 people in or around Newton wrote letters on defendant's behalf that were introduced into evidence at the sentencing hearing. The letters indicated that defendant was "intelligent, a leader, an excellent athlete, a hard worker, ambitious and popular with his peers and elders." School officials characterized defendant as "a healthy, active boy in high school . . . a good kid with good ability and average achievement." Defendant's former swim coach had a less positive view.

After graduating from high school, defendant worked at home for a year and then attended college for two years. During this time, he began to drink and by the age of 19, had become a "heavy drinker," and by the age of 21, he had become, in his view, an alcoholic. In January 1978, he was charged with petty larceny, as he had stepped outside a bar with a full drink in his hand; he pled guilty and was fined $20.

In September of 1978, after his second year of college, defendant came to this state and began to work with a real estate firm in San Bruno. According to M. Horowitz, his supervisor, defendant was a hard worker, dressed well, and was well liked. Horowitz believed defendant had tremendous potential. Defendant studied hard to pass his real estate license examination and did so. However, his license was held up as

he had listed the petty larceny conviction on his application. Defendant was very disappointed. Although a hearing was scheduled for June of 1979, defendant did not appear at the hearing but returned to Iowa.

Defendant indicated that during the summer of 1978, he continued to drink and began to use cocaine heavily. He spent $1,000 a month on these substances, and exhausted his savings. During this summer, his parents "sensed something was wrong, but they did not know what was troubling him.... [H]e seemed 'phony and nervous.'" A long-time family friend also observed that defendant was uncharacteristically unkempt and that "something was bothering" him. Defendant left Newton in June and hitchhiked back to California. Horowitz also confirmed a change and noted that defendant was sloppy and evasive on the few occasions when they happened to meet. Early in July defendant met Haggard in Utah. Toward the end of July, they and others arrived in Foster City and moved into defendant's apartment.

At the sentencing hearing, defendant's parents, friends and neighbors, in person and by numerous letters, asked the court to grant probation. They detailed his earlier years in Iowa, described his many positive qualities, and expressed shock and disbelief that he had committed such a serious crime, so foreign to "the Joe Axtell I knew." Both parents and neighbors also described the change that had come over defendant during the months preceding the crime. Defendant received considerable community support, including a firm job offer from an Iowa friend and businessman.

Defendant also requested probation so that he could return to Iowa. He described his heavy use of alcohol and drugs, and their harmful effect on him. He expressed remorse for the crime and acknowledged that he had "put a family through a terrible experience in the hopes of satisfying my need, at the time, for money." He claimed that his confinement in jail had "cleared the alcohol and drugs out of my system, to a point that I can now look forward to a life without depending on either of the two." He also stated that, if permitted to return to Iowa, he would resume his college education and combine work, study, and volunteer work with school or church organizations.

Richard A. Kunin, the defense psychiatrist, opined that the character of defendant's crime was definitely a departure from his usual behavior. Kunin believed that the crime was motivated in large part by defendant's dependency on alcohol and cocaine and his need to support his

habit. Kunin further opined that defendant's drug addiction had altered his personality and distorted his state of mind; that in one sense, it demonstrated "the extent to which his judgment had become impaired after three years of alcohol and drug abuse." According to Kunin, defendant "did not believe that he was acting out a serious crime"; that since "no one would get hurt and that since he was not carrying a loaded gun, his action was only a sham, not a true armed robbery." According to Kunin, defendant accepted these irrational beliefs because of "the narrowing of the scope of his thinking caused by prolonged exposure to alcohol and mind-altering drugs." Kunin opined that defendant was ready to abstain from alcohol and intoxicants, and that "it is very unlikely that he will ever repeat such serious criminal behavior."

At the sentencing hearing, numerous witnesses testified and were cross-examined, including the victims, the probation officer, Kunin, Horowitz and a family friend from Iowa. Defendant called Mr. deKulp, who expressed his desire that defendant receive psychiatric counselling rather than a prison sentence. Mrs. deKulp indicated that she experienced no fear as the result of her contact with defendant after the crime.

Mr. Mills and the other victims of the crime, however, insisted upon imprisonment. In a letter to the court (also attached to the probation officer's report) and in testimony at the sentencing hearing, the victims expressed a belief that defendant should serve the maximum term allowed by law. Although none of the victims was physically injured, each described various psychological traumas that had continued to affect their lives, and which each feared would always remain. Mills stated that defendant had shown "a definite mean streak," with no concern for anyone; Mills also believed that defendant's act of "hog tying my daughter is unforgivable." In Mills' opinion, "society will best be served by having them sentenced to the maximum time prescribed by law, thus setting an example that society will not tolerate" the various crimes which they committed. A letter expressing similar views was submitted to the court by the senior vice president of the Bank of America.

The probation officer, daCunha, also recommended imprisonment. He noted that "this offense is a crime of violence, resulting in psychological trauma and fear by the victims. . . ." The time elapsing between defendant's initial entry and departure from the Mills home was about four and one-half hours. He noted that defendant had planned the crime and was the leader. There had been an extensive period of prep-

aration, as defendant opened an account at the bank in October 1978, followed Mills to his home and purchased the shotgun several months prior to the crime. daCunha rejected Kunin's conclusions and observed: "... it should be kept in mind that the doctor's impression of the defendant is based on his contacts with the defendant in the jail since the offense and not during the weeks that preceded" it. daCunha noted that at the time of the offense, defendant was not under the influence of drugs or alcohol. Throughout the investigation, defendant had been "most cooperative and congenial" and had confessed and expressed some remorse. daCunha did not agree with Kunin that defendant had accepted his failure at crime. daCunha was left with the impression that defendant believed he failed only because he had chosen the wrong confederates. daCunha's report also referred to a letter defendant had written from jail in which he stated he was bored and the crime seemed like "excitement and money."[2] The district attorney concurred in the recommendation of the probation officer because of the seriousness of the crime.

The record indicates that the sentencing court characterized the crime as a "heinous" one, but expressed its compassion for the defendant, as well as for the victims. The court acknowledged the community support and termed the case "extremely difficult." The court also indicated, after pronouncing sentence, that, apart from the nature of the crime, defendant would never be sent to prison.[3] The court expressly recognized the serious nature of the crime and the trauma inflicted upon the victims, and stated: *"I had previously advised counsel that the only way these two young men would not go to prison would be if the victims came forth and said they wanted to extend some degree of mercy. They were the ones representing society* and in some degree of charity they would come through and say 'yes we understand it is a terrible thing but let's show a little mercy on this.' They have done just the opposite." (Italics added.)

The court acknowledged that defendant would have a very difficult time in prison. "I think even though Mr. Mills believes twenty years is not long enough, I think one year in prison is long. But I don't have any

---

[2]This letter is the focus of defendant's petition for habeas corpus, 1 Criminal No. 21664, discussed in a separate opinion.

[3]"I think that these two young men would probably never do anything like this again having gone through what they have gone through and what they have experienced and knowing the time they could be spending in prison."

control over that. The Legislature has spoken and says that this is what the punishment is." The trial court denied probation and sentenced defendant to state prison "for the term prescribed by law," life imprisonment, with the possibility of parole.

■ Defendant's only contention on this appeal is that the court abused its discretion by complying with the victims' wishes for imprisonment and, therefore: 1) denied him probation on legally impermissible grounds; and 2) deprived him of his due process rights to an impartial sentence. We cannot agree.

As defendant correctly points out, in this state the decision to grant or deny probation must be based on three factors: 1) whether confinement is necessary to protect the public from the defendant; 2) whether the defendant can best be rehabilitated through imprisonment or normal community contact; and 3) whether probation would unduly depreciate the seriousness of the crime (*People v. Bolton* (1979) 23 Cal.3d 208, 217 [152 Cal.Rptr. 141, 589 P.2d 396]; see *People v. Warner* (1978) 20 Cal.3d 678 [143 Cal.Rptr. 885, 574 P.2d 1237]; ABA Standards Relating to Probation, std. 1.3).

The conditions under which probation may be granted are defined by Penal code section 1203, subdivision (b), so far as pertinent, as follows: "If the court determines that there are *circumstances in mitigation* of the punishment prescribed by law or that the ends of justice would be subserved by granting probation to the person, it *may place him on probation.*" (Italics added.) Penal Code section 1203, subdivision (e), provides, so far as pertinent: "(e) *Except in unusual cases where the interests of justice would best be served if the person is granted probation, probation shall not be granted to* any of the following persons . . . . .

"(2) *Any person who used* or attempted to use *a deadly weapon* upon a human being in connection with the perpetration of the crime of which he has been convicted." (Italics added.)

Subdivisions (f)(g) and (h) then continue as follows: "(f) When probation is granted in a case which comes within the provisions of subdivision (e), the court shall specify on the record and shall enter on the minutes the circumstances indicating that *the interests of justice* would best be served by such a disposition.

"(g) *If a person is not eligible for probation, the judge may, in his discretion, refer the matter to the probation officer for an investigation*

*of the facts relevant to the sentencing of the person.* Upon such referral, the probation officer shall immediately investigate the circumstances surrounding the crime and the prior record and history of the person and make a written report to the court of his findings." (Italics added.)

"(h) In any case in which a defendant is convicted of a felony and a probation report is prepared pursuant to subdivision (a) or (g), the probation officer *shall obtain and include in such report a statement of the comments of the victim concerning the offense.* The court may direct the probation officer not to obtain such a statement in any case where the victim has in fact testified at any of the court proceedings concerning the offense." (Italics added.)

In addition to the above statutory provisions, the sentencing rules explain in detail the criteria affecting the decision to grant probation, including: the nature, seriousness and circumstances of the crime; whether a deadly weapon was used; whether the defendant planned or instigated the commission of the crime; whether the manner in which the crime was carried out demonstrated criminal sophistication; the defendant's remorsefulness and willingness and ability to comply with the terms of probation; age, education, health, mental faculties, family background; employment history; abuse of alcohol or narcotics; the likely effect of imprisonment on the defendant, and the possible effects of a felony conviction on the defendant's life (Cal. Rules of Court, rule 414). The circumstances in aggravation which may be considered by the sentencing court, so far as here pertinent, include whether: the crime involved threat of great bodily harm; the defendant used a weapon; the victim was particularly vulnerable; the crime involved multiple victims; the defendant was in a position of leadership; the crime involved the taking of great monetary value (Cal. Rules of Court, rule 421). Each of the above criteria had to be weighed as to the defendant. In addition, as a result of his use of a sawed-off shotgun,[4] the court was faced with the strong statutory presumption against granting probation of subdivision (e)(2), quoted above at page 255.

■ Defendant recognizes that probation is not a matter of right, but an act of grace or clemency, the granting or denial of which is within the court's discretion (*People* v. *Goodson* (1978) 80 Cal.App.3d 290, 295 [145 Cal.Rptr. 489]) and that in determining whether a convicted

---

[4]The fact that the gun was not loaded is of no help to defendant since each of the victims believed that it was.

defendant is a deserving candidate for clemency, the court is entitled to consider all the facts and circumstances of the case, including the probation officer's report. (*People* v. *Podesto* (1976) 62 Cal.App.3d 708, 723 [133 Cal.Rptr. 409].) ■ Defendant, however, argues that here, the court abdicated its function and, in part, based his sentence on impermissible criteria. We do not agree. In *People* v. *Warner, supra*, 20 Cal.3d 678, the Supreme Court emphasized the importance of the probation officer's report and held that where, as here, the recommendations were supported by the evidence, the court would *not* abuse its discretion by following the probation officer's recommendation.

■ Defendant next maintains that since the Penal Code section 12020 count was stricken pursuant to the plea bargain, it could not be considered to deny him probation pursuant to Penal Code section 1203, subdivision (e)(2), quoted above. This contention is without merit. *People* v. *Guevara* (1979) 88 Cal.App.3d 86, 92-93 [151 Cal.Rptr. 511], held that the plea bargain only prevents enhancement of the sentence for dismissed possession and use counts. However, pursuant to California Rules of Court, rule 421(a)(2) and Penal Code section 1170, subdivision (b), a sentencing court may consider all of the circumstances, (i.e., everything that has a legitimate bearing on the issue), including weapons use, or possession as aggravating factors regardless of whether these facts were charged, chargeable or dismissed. As the court observed in *Guevara*, at page 93: "To say the possession and use of the shotgun was not one of the circumstances of the kidnap of Mark is to place blinders on a sentencing judge the Legislature did not expressly or impliedly intend." Our Supreme Court recently approved *Guevara* in *People* v. *Harvey* (1979) 25 Cal.3d 754, 758 [159 Cal.Rptr. 696, 602 P.2d 396].

Here, given the legislative restrictions on the sentencing court's exercise of its discretion, defendant's argument is tantamount to saying that the court abused its discretion in determining that his was *not* an "unusual case," within the exception of Penal Code section 1203, subdivision (e), quoted above. *People* v. *Navarro* (1972) 7 Cal.3d 248 [102 Cal.Rptr. 137, 497 P.2d 481], held that as to Welfare and Institutions Code sections 3051-3052, where the Legislature similarly had limited sentences to narcotic treatment programs to *unusual* cases, determination of whether a case was *unusual* was for the court. At oral argument, defendant conceded that a reasonable interpretation of the court's statement, quoted above at page 255, was that the court was merely explaining why this was not an "unusual" case.

■ Defendant further complains that the victims' comments "concerning the offense" within the meaning of Penal Code section 1203, subdivision (h), does not include the opinion of a victim about the appropriate sentence. This court (Div. One) held to the contrary in *People v. Beasley* (1970) 5 Cal.App.3d 617, 633 [85 Cal.Rptr. 501]. There, as here, the victim requested that probation be denied and described her fears and prolonged psychological damage she suffered as a result of the crime. Further, as indicated above, Penal Code section 1203, subdivision (h) directs the probation officer to obtain and include in his report the comments of the victim. At oral argument, defendant conceded that the inclusion of the victim's views on the appropriate punishment could serve a therapeutic function to remove grudges. We reiterate that the court's comments, when read in the light of the entire record, provide no basis for his contention that he was deprived of an impartial determination of his sentence.

Defendant emphasizes the court's expressions of compassion quoted above. Defendant's arguments ignore the rule that requires a court, in exercising its discretion, to be controlled by principles of law and not to be swayed by sympathy (*People v. Bolton, supra*, 23 Cal.3d 208; *People v. Beasley, supra*, 5 Cal.App.3d 617).

■ Next, we turn to defendant's contention that the court's statement that the victims "represented society" is contrary to the principle that a criminal prosecution vindicates a public wrong rather than a private one. Defendant also maintains that by following the victims' suggestion of a prison sentence, the court provided private redress and failed to independently exercise its discretion as required by law. We do not agree. The victims served as witnesses and the court was entitled to weigh their testimony. The court's characterization of the instant matter as "extremely difficult" reflects its balancing and consideration of all of the circumstances of the probation criteria and factors in aggravation and mitigation mandated by the statutes and Rules of Court. We can only conclude that the record indicates that the sentencing court properly and independently exercised the power of the state on behalf of the People in the determination of defendant's sentence.

■ For his due process argument, defendant relies on *In re Hancock* (1977) 67 Cal.App.3d 943 [136 Cal.Rptr. 901]. *Hancock* is not apposite as there the sentencing court received information adverse to the defendant without his knowledge, and provided him with no opportunity to respond. The record here reveals no ex parte communications. As indicated above, all of the letters and Kunin's report were part of the

probation officer's report. Thus, defendant had ample opportunity to challenge or rebut their contents and present his witnesses at the sentencing hearing (*People v. Gelfuso* (1971) 16 Cal.App.3d 966 [94 Cal.Rptr. 535]). We conclude that there was no deprivation of due process.

■ Even assuming, without conceding, that any of the court's remarks were erroneous or improper, all judicial misstatements made during sentencing do not require a remand for resentencing (cf. *People v. Ramos* (1980) 106 Cal.App.3d 591, 602-603 [165 Cal.Rptr. 179]). The test is whether after an examination of the entire case, including the evidence, the court is of the opinion that it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of error (*People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]).

■ We conclude, on the basis of the entire record before us, that the interests of justice here did not require the court to depart from the mandate of Penal Code section 1203, subdivision (e) and find that this was an "unusual" case and defendant eligible for probation. The court, after considering all of the circumstances of the crime, the statutory requirements and the probation criteria detailed by the court rules, could reasonably conclude that: 1) granting probation to the defendant would unduly deprecate the seriousness of the offenses as to seven victims held hostage for four and one-quarter hours; 2) confinement was necessary to protect the public; and 3) defendant could best be rehabilitated through imprisonment. Defendant has not met his burden of showing an abuse of discretion in denying his request for probation (*People v. Goodson* (1978) 80 Cal.App.3d 290 [145 Cal.Rptr. 489]). In the absence of a clear showing that the sentencing decision was irrational or arbitrary, a trial court is presumed to have acted to achieve legitimate sentencing objectives (*People v. Gimenz* (1975) 14 Cal.3d 73 [120 Cal.Rptr. 577, 534 P.2d 65]; *People v. Podesto* (1976) 62 Cal.App.3d 708 [133 Cal.Rptr. 409]).

The judgment is affirmed.

Rouse, J., and Miller, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 16, 1981.