Filed 12/4/14  P. v. Christian CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JAMES LEWIS CHRISTIAN,<br><br>        Defendant and Appellant. | A140566<br><br>(Sonoma County<br>Super. Ct. No. SCR620070) |

Following a jury trial, appellant James Lewis Christian was convicted of several felony counts including attempted murder and assault with a deadly weapon against Steven Halloran.  He argues the attempted murder conviction must be reversed because the court failed to instruct the jury on attempted voluntary manslaughter as a lesser included offense, and further contends the court erred in imposing a consecutive sentence on the assault count.  We affirm.

## I.  FACTS AND PROCEDURAL HISTORY

Appellant rented a room in a house in San Rafael owned by his friend Lee Dellwig.  Both men were in their late sixties and had serious health problems.  Appellant sometimes stayed at the Santa Rosa apartment of Belinda Marrufo.  After a car he had borrowed from Dellwig was stolen from Marrufo's apartment complex and appellant's bank card was used to make unauthorized online purchases, appellant suspected he was being victimized by Marrufo, her adult son Les Spadoni, and Spadoni's wife.

On June 8, 2012, appellant called Marrufo from San Rafael and argued with her about the suspected thefts. He had consumed a considerable amount of vodka and cranberry juice, and when he got off the phone, he argued with Dellwig and physically attacked him as Dellwig sat on an outdoor commode.[1] A home health nurse who cared for Dellwig arrived at the front door shortly after the altercation and was met by appellant, who was holding a knife. As the nurse attended to Dellwig, appellant appeared very angry. He took a Remington double-barreled shotgun from Dellwig's closet, gathered up some shells for the gun and told Dellwig he was borrowing his truck.

At about 4:00 p.m. that same day, appellant arrived at Marrufo's apartment complex in Santa Rosa and parked the truck in the parking lot. Steven Halloran, who lived in one of the units, was speaking with his neighbor, Julia Agueros, in a common area. Both were in their late teens, and neither one knew appellant or had seen him before.

Appellant got out of the truck and approached the pair, pointing a shotgun toward them. Halloran, who was not fearful at first, made a friendly comment to appellant regarding the gun and approached appellant. Appellant smiled and spoke incoherently while pointing the gun at Halloran. Halloran heard a "click," like two marbles colliding, and saw appellant shaking the gun. As Halloran stepped closer, appellant pulled out a knife and began slicing at Halloran, stabbing him in the left pectoral muscle.[2] Appellant swung the knife at Halloran two or three more times and said words to the effect of "run, motherfucker" before Halloran ran away. Halloran did not do or say anything to provoke the attack or antagonize appellant.

Agueros saw appellant had two large knives in his hands, as well as the shotgun. After Halloran fled, appellant pointed the gun at Agueros from a distance of eight to ten

---

[1] Dellwig's health problems made it difficult for him to walk to the bathroom in the house, so he had placed a portable commode on a patio outside the room where he was sleeping.

[2] Halloran, who stands six feet five inches tall and weighs nearly 300 pounds, described the wound as a slice "down into my lovely fleshy meats."

feet, and Agueros heard a clicking noise coming from the gun. Agueros told appellant, "Do not point that fucking shotgun at me," and appellant responded, "You better run, little girl." Thinking it was best to remain calm, Agueros got up and walked to the manager's unit and reported what had happened.

Appellant continued through the complex toward Marrufo's apartment. His hand was bleeding and he was still carrying the gun and a knife. Appellant ran into Marrufo's neighbor Sean Napier at the bottom of the stairs to Marrufo's apartment and told Napier something to the effect of "I'm going to kill everybody." Napier hurried to the manager's office and found police officers arriving. Appellant entered Marrufo's apartment, as later evidenced by a trail of blood.

The officers found appellant at the bottom of the stairs leading to Marrufo's apartment and placed him under arrest. He was holding a shotgun in one hand and a knife in another, and a second knife was found in his pants pocket. The shotgun had two unfired rounds in the chambers. When appellant was taken into custody he asked the officers to shoot him and said he wanted to die. He was taken to the hospital for treatment because his hand was bleeding, and told the officer standing guard: "I got hate so bad for them people. I got no car. I gots no money. I got nothing left. I promise you I will kill the motherfuckers when I find them. They deserve to die." He made other remarks to the doctors and hospital staff about wanting to kill the people who had taken his money and his car. His blood alcohol level was 0.10 percent at 8:40 p.m. on the night he was arrested, meaning that with an average rate of elimination, it would have been 0.16 percent, or twice the legal limit, at the time of the stabbing.

In an interview by police officers, appellant acknowledged taking Dellwig's shotgun and some knives and driving to Santa Rosa. He said he was going to shoot Marrufo, her son, and her daughter-in-law and, "If I couldn't shoot 'em I was gonna stab 'em to death." He denied stabbing Halloran, but acknowledged that if Halloran had been Les Spadoni he would have stabbed him. Appellant admitted entering Marrufo's apartment.

3

The shotgun recovered from appellant was operable and had a safety function. The two shells found in the gun did not have firing pin marks, indicating the trigger was not pulled while the safety was turned off. A clicking action can be produced from moving the safety between the on and off positions or by trying to quickly pull the trigger with the safety engaged.

The Sonoma County District Attorney filed an amended information charging appellant with attempted murder with premeditation and deliberation against Halloran and Agueros (counts one and four; Pen. Code,[3] §§ 664, 187); assault with a firearm against Halloran and Agueros (counts two and five; § 245, subd. (a)(2)); assault with a deadly weapon, a knife, against Halloran (count three; § 245, subd. (a)(1)); residential burglary of Marrufo's apartment (count six; § 459); and carrying a loaded firearm in a vehicle (count seven; § 25850). Also included were enhancement allegations for personal use of a firearm in counts one and four (§ 12022.53, subd. (b)); personal use of a firearm in counts two and five (§ 12022.5, subd. (a)); arming with a firearm in counts one, three and six (§ 12022, subd. (a)(1)); and personal use of a knife in count one (§ 12022, subd. (b)(1)).

The case proceeded to a jury trial at which appellant testified. He explained that Dellwig's car had been stolen from outside Marrufo's apartment complex in late May 2012, after she had instructed him to park it in a space where he could not see it. He suspected Marrufo's son Spadoni was involved because Spadoni had recently been released from prison and had been part of a burglary ring. When appellant awoke on June 8, 2012, he was in a lot of pain from his neck and consumed half a 750-milliliter bottle of vodka. His bank's fraud unit had called him the day before to tell him his account was overdrawn and that recent purchases did not fit his profile. He was arguing with Dellwig and tackled him on the commode after speaking to Marrufo on the phone.

Appellant testified he decided to go to Santa Rosa to find out who stole the car and his money. He took two steak knives with him because Marrufo did not have any sharp

---

[3] Further statutory references are to the Penal Code unless otherwise indicated.

knives among the kitchen utensils in her apartment. He took the shotgun for protection because of what he knew about Spadoni, but before he left the house in San Rafael he tried to test-fire it and the trigger did not work. He was so drunk he did not remember whether the safety was off.

Appellant met with Marrufo at her mother's house in Santa Rosa, but she was busy with a garage sale. He did not remember driving to her apartment, but did remember picking up the gun and the two knives and walking up the sidewalk, where he saw a "big dude" coming toward him with something in his hands.[4] The man said something about the shotgun and appellant lifted it up, though he did not actually point it at the man. Appellant did recall pointing the gun at the woman who was with him (accidentally, as he was picking it up). He denied stabbing Halloran or making the gun click, and did not intend to hurt either Halloran or Agueros. Appellant went to Marrufo's apartment, though he did not remember being inside. After he was taken into custody by the police, he acted tough and bragged about wanting to kill Marrufo and Spadoni so the police would think he was tough, as that was the way he was raised.

The jury convicted appellant of all counts except the attempted murder of Agueros (count four) and found the enhancement allegations true, but found the attempted murder of Halloran (count one) was not premeditated. Because it did not return a finding appellant was not in lawful possession of the firearm, the conviction for carrying a loaded firearm in a vehicle was treated as a misdemeanor. (See § 25850, subd. (c)(4) & (7).) The court sentenced appellant to prison for an aggregate term of 22 years 4 months on the felony counts, which included consecutive sentences on all counts except the assault with a firearm against Halloran (count two). The sentence on count seven, a misdemeanor, was ordered to run concurrently.

---

[4] Halloran had been "spinning poi," a form of fire dancing that involved weights attached to a string.

## II. DISCUSSION

### A. Failure to Instruct on Attempted Voluntary Manslaughter as a Lesser Included Offense

The trial court denied defense counsel's request for jury instructions on attempted voluntary manslaughter as a lesser included offense of attempted murder, based on theories of both heat of passion and imperfect self-defense. (See *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1136-1137.) Appellant contends the denial of the instruction under the heat of passion theory was prejudicial error. We disagree.

A trial court has a duty to instruct on a lesser included offense when there is substantial evidence, viewed in the light most favorable to the defendant, from which a rational jury could conclude the defendant committed the lesser offense and is not guilty of the greater crime. (*People v. Moye* (2009) 47 Cal.4th 537, 553 (*Moye*); *People v. Breverman* (1998) 19 Cal.4th 142, 162.) Although the duty to instruct on a lesser included offense implicates the defendant's constitutional right to have the jury determine every material issue in the case (*People v. Cook* (2006) 39 Cal.4th 566, 596), the standard for requiring such instruction is not " ' "any evidence, no matter how weak," ' " but evidence " ' "substantial enough to merit consideration" by the jury.' " (*Moye*, *supra*, 47 Cal.4th at p. 553.)

Attempted murder requires a direct but ineffectual act toward killing a person, accompanied by the mental state of express malice aforethought. (*People v. Houston* (2012) 54 Cal.4th 1186, 1217.) Attempted voluntary manslaughter is the unlawful killing of a person without malice, and is a lesser included offense of attempted murder. (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1241.) A defendant who acts in a sudden quarrel or heat of passion lacks the malice necessary for attempted murder. (*Ibid.*)

The heat of passion variant of voluntary and attempted voluntary manslaughter has both a subjective and an objective component: "The defendant must actually, subjectively, kill [or attempt to kill] under the heat of passion. [Citation.] . . . [But the] 'passion must be such a passion as would naturally be aroused in the mind of an

6

ordinarily reasonable person under the given facts and circumstances.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1252-1253.)

"To satisfy the subjective element of this form of voluntary [and attempted voluntary] manslaughter, the accused must be shown to have killed [or attempted to kill] while under 'the actual influence of a strong passion' " caused by the provocation. (*Moye*, *supra*, 47 Cal.4th at p. 550.) The passion aroused need not be anger or rage, but it cannot be the passion for revenge. (*People v. Beltran* (2013) 56 Cal.4th 935, 948 (*Beltran*); *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144; *People v. Montes* (2003) 112 Cal.App.4th 1543, 1548.) As for the objective component, " '[t]he provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.' " (*Moye*, *supra*, 47 Cal.4th at p. 550.)

Applying these principles, we conclude there was no substantial evidence to support an instruction on attempted voluntary manslaughter based on provocation and heat of passion. The subjective component was not satisfied because to the extent appellant was under the influence of a strong emotion, that emotion was a passion for revenge, which cannot support a provocation/heat of passion theory. (*Beltran*, *supra*, 56 Cal.4th at p. 948.) The objective component is not satisfied because Halloran did nothing during his encounter with appellant that could be considered provocative, much less provocative enough to "render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*Id.* at p. 957.)

Appellant suggests his anger at Les Spadoni gave rise to legally adequate provocation, citing case law regarding transferred intent. We are not persuaded. Although transferred intent can support a murder conviction where nontargeted individuals are killed, the doctrine does not apply in an attempted murder case. (*People v. McCloud* (2012) 211 Cal.App.4th 788, 797.) Moreover, the provocation necessary to support an instruction on voluntary manslaughter or attempted voluntary manslaughter must come from the actual victim or be conduct the defendant reasonably believed to be

7

committed by the actual victim. (*People v. Verdugo* (2010) 50 Cal.4th 263, 294; *People v. Avila* (2009) 46 Cal.4th 680, 705.) Though the prosecutor posited during closing argument that appellant, in his drunken state, might have confused Spadoni and Halloran, appellant's own testimony and statements to the police made it clear he did not. The trial court did not err in declining the instruction on attempted voluntary manslaughter.

B. <u>Consecutive Sentences for Attempted Murder and</u>
<u>Assault with a Deadly Weapon</u>

Appellant was convicted of three counts in which Halloran was the victim: attempted murder in count one; assault with a firearm in count two; and assault with a deadly weapon, a knife, in count three. The court stayed the sentence on the assault with a firearm count under section 654, and also stayed the enhancements for being armed with a gun and using a knife on the attempted murder count. It imposed a consecutive sentence on the assault with a deadly weapon count. Appellant argues the court should have imposed a concurrent term for assault with a deadly weapon, because it was part of the same continuous transaction as the attempted murder and did not involve a separate act of violence. We reject the claim.

Initially, we disagree with the People that appellant's trial counsel forfeited this claim by failing to lodge a timely objection to this aspect of the sentence. Counsel urged the court to impose concurrent terms on all counts because they were part of a single period of aberrant behavior, implicitly invoking rule 4.425(a) of the California Rules of Court.[5] This was sufficient to preserve the issue now raised. (Contrast *People v. de Soto* (1997) 54 Cal.App.4th 1, 9 [general objection to upper term and consecutive sentences insufficient when counsel provided no legal or factual basis to support the objection].)

---

[5] Rule 4.425(a) of the California Rules of Court sets forth crime-related criteria affecting the imposition of consecutive rather than concurrent sentences: "(1) The crimes and their objectives were predominantly independent of each other; [¶] (2) The crimes involved separate acts of violence or threats of violence; or [¶] (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior."

Turning to the merits, it is well established trial courts have broad discretion to decide whether concurrent or consecutive sentences are appropriate. (*People v. Clancey* (2013) 56 Cal.4th 562, 579; *People v. Leon* (2010) 181 Cal.App.4th 452, 468.) "In the absence of a clear showing of abuse, the trial court's discretion in this respect is not to be disturbed on appeal. [Citation.] Discretion is abused when the court exceeds the bounds of reason, all of the circumstances being considered." (*People v. Bradford* (1976) 17 Cal.3d 8, 20.) "[I]n the absence of a clear showing that its sentencing decision was arbitrary or irrational, a trial court should be presumed to have acted to achieve legitimate sentencing objectives and, accordingly, its discretionary determination to impose consecutive sentences ought not be set aside on review." (*People v. Giminez* (1975) 14 Cal.3d 68, 72.)

The trial court acknowledged the crimes in this case were committed during a period of ongoing criminality, but "[a]lthough moments apart and geographically generally in the same location, there was time to pause, there was time to reconsider." Viewed in the light most favorable to the sentence imposed, the evidence showed appellant attacked Halloran with two separate weapons, resorting to the knife after the gun failed to fire. The trial court could reasonably determine appellant should receive a consecutive term for each of these attacks, and it did not abuse its discretion by ordering the sentence for assault with a deadly weapon under count three to run consecutively.

## III. DISPOSITION

The judgment is affirmed.

_____

NEEDHAM, J.

We concur.

_____

JONES, P. J.

_____

SIMONS, J.