Filed 11/12/13  P. v. Saxton CA2/7 (11/7/13 modification & unmodified opn. attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DAVID SAXTON,<br><br>Defendant and Appellant. | B236087<br><br>(Los Angeles County<br>Super. Ct. No. BA374252)<br><br>ORDER CORRECTING<br>MODIFICATION |

The modification of the captioned opinion, filed on November 7, 2013 is corrected to reflect the proper superior court case number, BA374252.

PERLUSS, P. J.

Filed 11/7/13 P. v. Saxton CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>DAVID SAXTON,<br><br>　　　Defendant and Appellant. | B236087<br><br>(Los Angeles County<br>Super. Ct. No. BA374242)<br><br>ORDER MODIFYING OPINION;<br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed October 10, 2013, and not certified for publication, be modified in the following respects:

1.  On page 2, third paragraph, in the first sentence, the name "Demiya" should read "Demyia". The second sentence, which begins with "After questioning," should read, "After questioning the others about the murder, police arrested appellant in connection with an unrelated assault on Jesse White and robbery of Kenneth Bell, known as 'Chaboy,' which occurred before the murder of Xray."

2.  On page 3, in the first sentence of the first paragraph, "Demiya" should read "Demyia".

3.  On page 4 of the opinion, in the fourth full paragraph, the first sentence reads as follows: "Nash was taken into custody on October 16, 2010." It should read: "Nash was taken into custody in October 2010."

1

4.  On page 6, in the first line, the first full sentence which begins with "Later on," should be modified to read, "Later on, in the courthouse holding cell, appellant and Chaboy were involved in a second fistfight."

5.  On page 6, in the last paragraph, the first sentence, which begins with "Appellant was charged," the phrase "the assault of Chaboy on July 15" should be modified to read "the assault of Chaboy on July 19".

6.  On page 9, the first word on the page should be "Nash" instead of "appellant."

7.  On page 9, in the second full paragraph, the first sentence, beginning with "Chaboy testified," should be modified to read "Chaboy testified at trial that he met appellant once."

8.  On page 16, in the second full paragraph, the fourth sentence which begins with "According to Nash," the words "and Sanders" should be deleted.

9.  On page 19, in the third full paragraph, the last sentence reads "Chaboy and Nash gave consistent versions about the confrontation in the holding cell."  That sentence should be deleted.

Saxton's petition for rehearing is denied.  The foregoing does not change the judgment.

**PERLUSS, P. J.**          **WOODS, J.**          **ZELON, J.**

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B236087 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA374252) |
| v. | |
| DAVID SAXTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Ronald S. Coen, Judge. Affirmed.

Marleigh A. Kopas, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Eric E. Reynolds and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

David Saxton (appellant) was convicted by a jury of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)[1]) and dissuading a witness by force or threat (§ 136.1, subd. (c)(1)). In a bifurcated proceeding, he admitted that he suffered two prior convictions for serious or violent felonies within the meaning of section 1170.12, subdivisions (a) through (d) and section 667, subdivisions (b) through (i); and five prior convictions for which he had served separate prior prison terms (§ 667.5, subd. (b)). He was sentenced to 55 years to life in prison consisting of 25 years to life for the assault, 25 years to life for dissuading a witness, and one year for each of the five prior prison terms. He appeals, contending that the court erred in refusing to allow him to impeach a key prosecution witness and in allowing the prosecutor to present gang evidence; the prosecutor committed misconduct by cross-examining appellant on his gang affiliation; he was repeatedly denied effective assistance of counsel; his constitutional rights were violated; and the cumulative effect of the errors was prejudicial. We affirm.

*FACTUAL & PROCEDURAL BACKGROUND*

*Summary*

In the early morning hours of July 19, 2010, appellant called 9-1-1 about a shooting in the skid row area of Los Angeles near 6th and Maple Street. Appellant remained at the scene. The body of the victim, a man known as Xray,[2] was discovered. Bullets and shell casings were found in the area but no gun was recovered. Police interviewed appellant at the station and a gunshot residue test was performed on his hands. The test results were inconclusive. Appellant was released.

The police questioned several others who were in the area, including Demiya Sanders and Wendell Nash. After questioning the others about the murder, police arrested appellant in connection with an unrelated assault and robbery on Kenneth Bell, known as "Chaboy," which occurred before the murder of Xray. Appellant was not charged with the murder of Xray.

---

[1]    All further undesignated statutory references shall be to the Penal Code.

[2]    Xray's given name was Josey or Jody Heard.

2

*The police interviews on July 19th*

Demiya Sanders was interviewed informally outside the police station the evening of Xray's murder. She was then taken inside the station and interviewed by Los Angeles Police Officer Sergio Ortiz in a videotaped session. She told the police she had seen an earlier altercation between appellant and Chaboy,[3] but did not give them appellant's name. She said appellant was wearing red, and during the fight with Chaboy, he called someone on the phone. Shortly thereafter, another person arrived in a doo-rag and blue-hooded sweater. Sanders referred to him as appellant's "brother." The person in the hooded sweater took out a gun, and appellant said, "Give me the thing." The "brother" fired one shot, and Chaboy fell and started running. Sanders also said that the person in blue changed to a green and black shirt. Sanders left the area, walked around for about 30 minutes and then heard two shots. Someone came up to her and told her Xray had just been shot after an argument by someone wearing red flannel. Sanders had known Xray for several years. Sanders did not see the shooting of Xray. When asked if she knew the person in red flannel, Sanders said she knew he was a Blood from Laudas Park.

Wendell Nash was also interviewed on July 19th by two other officers. Nash saw appellant in a red and black plaid shirt talking to a man in the neighborhood known as Xray. Xray appeared to be angry and appellant was calm. Nash left the area. Nash did not tell police he saw appellant shoot Xray. Nash did not identify appellant by name, just by a description of his clothing.

On July 21st, Officer Ortiz interviewed Jesse White, Chaboy's brother, who had been arrested on an unrelated charge. White's nickname was "Pooh."

On July 22, 2010, Chaboy walked into the police station on his own. He was interviewed and the interview was videotaped. Chaboy told Officer Ortiz that appellant came up to him and his brother on July 15, 2010. Chaboy did not know appellant's name but knew what gang he belonged to and knew that people called him "the guy from Hacienda." Chaboy said appellant "comes up banging on everyone. He's making sure

---

[3]     The reporter transcribed the name as "Jaboy."

3

that everybody's a Blood that's around us."  Appellant pointed a pistol at him and Chaboy ran.  Appellant took Pooh's cell phone and ID.  A few days later, Chaboy, his brother Pooh, and Sanders were sitting on a crate in the street on the corner of 5th and San Julian Streets.  Appellant approached, wearing a red coat.  Appellant and Chaboy argued and appellant hit Chaboy.  Someone rode up on a bicycle and appellant called him "his brother."  Appellant's friend pulled a pistol and shot at Chaboy.  Chaboy ran.  About 15 minutes later, Xray was shot.  Chaboy identified appellant from a photographic line up.

Officer Ortiz realized there was a possible connection between the Xray shooting and the Chaboy shooting because Sanders, Nash and Chaboy all described someone wearing a red and black flannel shirt or jacket.

*Arrest*

Appellant was arrested on July 29, 2010, on 7th Street between Wall and San Julian Streets, about two to three blocks from the location where Chaboy was assaulted.

*Nash's subsequent statements*

On July 30, 2010, Nash identified appellant's photograph during a taped interview with Detective Oritz but did not say he had seen the shooting of Xray.

Nash was taken into custody on October 16, 2010.  He wrote a letter to the District Attorney identifying appellant as the one who shot Xray.  Police then interviewed Nash on October 25th.  Nash wrote another letter to the District Attorney in November 2010.  The letter said appellant was the shooter in a cold blooded killing.

Nash was interviewed again by Officer Ortiz on November 30, 2010.  Nash told him that on July 19th, shortly after midnight, he saw a confrontation between two brothers and a man dressed in a red plaid shirt with a black baseball cap.  Sanders walked away from the men and she told Nash the man in red had a gun.  Nash heard the man in red talk to one of the brothers.  The man in red got "huffy" and someone else arrived.  The man in red called the newcomer a "Blood."  The man in red punched the older brother, and said "Let me see that."  The older brother ran, then the shooter took aim and

shot. The older brother fell by San Julian and 5th Streets, so Nash thought he had been shot, but the brother got up and ran.

Nash then walked back across the street. The man in red stayed at the scene and confronted someone named Xray in front of the Los Angeles Mission. The man in red said, "I'm little somebody from Hacienda," and Xray said, "I'm from Watts." The man in red said he wanted to talk to Xray privately. Nash then heard a shot.

*The preliminary hearing*

At the preliminary hearing, appellant represented himself.

Nash testified at the preliminary hearing in disguise so appellant could not identify him. He was afraid for his life. He said he was on 5th and San Julian Streets shortly after midnight on July 19, 2010. He saw appellant with a red plaid shirt having an argument with a light-skinned man about a girl. Appellant made a phone call, telling someone to "come on down." Someone else arrived in a few minutes and talked to appellant. Appellant hit the light-skinned man. Appellant appeared to have his hand on a weapon inside his pocket. Nash saw a gun in the other man's hand. Appellant said, "Let me see that," or "Give me that," to his friend. The light-skinned man ran and appellant walked away calmly.

Nash said he also saw appellant in a confrontation with Xray, and then he saw appellant running away. He did not see appellant shoot Xray but thought appellant had the motive to do so because they "both gang bang." Nash did not report the shooting of Xray to the police.

During the preliminary hearing Nash testified that he was smoking marijuana on the night of the shooting and was on medication for psychological problems. He also testified that it was common knowledge that the neighborhood where the shooting occurred is a place to buy and sell drugs.

Chaboy testified at the preliminary hearing that he was currently in custody and that he had a confrontation with appellant in the Twin Towers of county jail that day because appellant said he "snitched on him." Appellant had shown him some paperwork with Chaboy's name on it. Appellant physically attacked Chaboy. Chaboy did not report

5

the incident when it occurred. Later on, in the courthouse holding cell, appellant hit Chaboy in the face. This incident was videotaped.

Chaboy had seen appellant on July 16, 2012, when Chaboy and his brother were sitting on a wall and appellant drew a gun after they had an argument about a girl. Appellant did not shoot but took his brother's cell phone at gun point.

A few days later on July 19th, appellant came up to Chaboy and his brother again and tried to hit Chaboy. Someone else came up on a bike, and took a gun out. A shot was fired but Chaboy did not see who fired the gun. Chaboy ran off and the man on the bike chased after him. Chaboy remembers that appellant was wearing a red jacket.

Chaboy did not know Xray, but knew his name. He did not know appellant's name but he knew he was from the Hacienda gang. Appellant had approached Chaboy and identified himself as affiliated with the Hacienda Village gang. Chaboy knew that appellant "hustle[s]" in the area.

Chaboy did not report the incident where appellant confronted him and his brother because of "a code in the streets . . . – what happens in the streets, stays in the streets." Chaboy admitted being a "drug offender."

Appellant testified on his own behalf at the preliminary hearing. He denied calling Chaboy a snitch because he did not even know who Chaboy was. He claimed Chaboy came up and hit him. He denied fighting with Chaboy. He claimed he said he went downtown with his girlfriend and called 9-1-1 to report the shooting of Xray. He did not see who shot him, but heard a shot as he walked past Xray. He denied being in a gang. He denied carrying a gun. He denied calling someone to come and meet him on July 19th. He admitted arguing with Pooh but denied there was a physical altercation.

*Charges against appellant*

Appellant was charged with the robbery of Pooh on July 15th, the assault of Chaboy on July 15, and dissuading a witness (Chaboy) by force or threat on August 16, 2010. The robbery charge was later dismissed.

6

*Trial testimony*

Appellant was represented by counsel at trial.[4]

Sanders testified at trial that around midnight on July 18th she saw appellant wearing a red and black sweater. She was talking with Pooh and Chaboy when appellant walked up. She had never seen appellant before. Appellant and Chaboy argued about a female and Chaboy accused appellant of robbing him. Chaboy and appellant went into the street and were about to fight. They never hit each other. A man rode up on a bike and appellant said to the man on the bike, "Shoot him." Appellant appeared to know the man. Sanders walked away and 15 to 20 minutes later saw appellant being detained by the police. She told the police that appellant actually tried to hit Chaboy. She did not tell police that appellant said, "Shoot him."

On cross-examination, appellant's counsel asked her if she was using or selling drugs that night. She denied doing either. She testified that appellant had on a red flannel shirt and a black baseball cap. She said that after the shot was fired she started walking towards Los Angeles Street, met some friends, walked up towards 6th Street. Fifteen minutes later, she heard another shot fired. Someone then told her that Xray had been shot but she did not witness the shooting.

Defense counsel again asked her if she had been drinking that night. The following colloquy took place: "Q. You are not a drug user? A. No. Q. Ever? A. No."

Defense counsel then asked, "Did anyone ever make any reference to gangs?" and Sanders answered, "Blood? Not, 'Where are you from?' But, Blood, yes."

On re-direct, Sanders testified that she had been homeless for about one and half years. Sanders said she usually stayed at the Midnight Mission, playing cards in the park. When asked why she did not report Chaboy's shooting she said she was just trying to get away and did not know if she would be followed.

---

[4] Attorney Dale Atherton was appointed to represent appellant after the preliminary hearing. Shortly before trial, Atherton was relieved due to a scheduling conflict. Jonathan Roberts was appointed and represented appellant during trial.

The videotape of Sanders' interview with police was played for the jury. She explained that the person with the doo-rag and a blue-hooded sweatshirt was the man on the bike. She also explained that a stocking cap and a doo-rag were the same thing and she referred to both of those when referring to the shooter.

Nash testified at trial that he was familiar with the area of 5th and San Julian Streets. He did not know appellant. He knew Chaboy and knew Pooh vaguely. He did not know Sanders. On July 19, Nash saw appellant, wearing a red "lumber jacket," challenging Chaboy. Appellant said something about "Niggers from Chicago and think that they could just move down here" and sell narcotics. Nash felt it was a territorial dispute. Appellant called someone on his cell phone. Nash heard appellant call himself "Little Dave from Hacienda." Nash later saw appellant running on Maple Street, say something to Xray, hold up a gun and shoot Xray in the head.

The prosecutor played a DVD of Nash's November 30, 2010 police interview for the jury and provided it with a redacted transcript of the audio recording.

Nash said he came to the preliminary hearing in disguise and used an accent because he did not want to testify. He was worried about his own safety. He was arrested on a narcotics charge after the incident with appellant and wrote to the District Attorney's office trying to negotiate a deal on his own case in exchange for testimony about appellant.

Nash admitted he was currently serving a prison sentence for narcotics sales. He was being housed in the "mental ward" for psychological problems and was currently being medicated.

Nash said when he was in a holding cell with appellant a few days earlier, appellant told him to say he lied about everything if called as a witness.

On cross-examination, Nash said that on July 19th police came up to him on the street and asked him to come inside the station. Nash admitted that he was smoking marijuana that evening. He did not tell the police that he saw appellant shoot Xray because he was afraid due to "street laws." In response to defense counsel's questions,

8

appellant said he was afraid because he believed appellant to be a gang member. Nash said he thought appellant was a Hacienda Blood and he called himself "Little David."

The first time he told police about the shooting of Xray was in the letter he wrote to the District Attorney on October 19 of 2010. In his first letter, he claimed he saw appellant shoot Xray point-blank in the head. In a second letter he said "the robbery victim is a suspected and known drug dealer" and a "known gang banger." He said appellant was "a vicious and extremely violent and heartless murderer that has put a hit out on my life." He hoped the letters would get him into a drug program.

Chaboy testified at trial that he met appellant once, when he was in custody on his own case. He never saw appellant with a handgun, and never saw him rob his brother. He admitted talking to Officer Ortiz but said he was lying. He claimed he was pressured by another officer into saying things and into agreeing with his brother's statement. He circled appellant's photograph because he knew him. He remembered getting into a physical altercation with appellant in the jail and another verbal altercation in the Twin Towers. He identified his signature, he identified his picture at the police station, and said he did not want to testify. He denied feeling his life was in danger.

Chaboy's July 22nd police interview was played for the jury and the jury was provided with a transcript of the recording. When shown the portion of the videotape where he said appellant pointed the gun at him and his brother, Chaboy denied seeing appellant point a gun at his brother.

Chaboy admitted he was in custody for selling narcotics. Chaboy's preliminary hearing testimony was read to him when he described the two altercations. The videotape of the altercation in the courthouse was shown to him. Chaboy said it showed appellant pushing him against a wall but also showed him attacking appellant. Chaboy then testified he lied about the incident to the District Attorney and lied at the preliminary hearing.

Officer Ortiz testified. He had interviewed Chaboy, Sanders, and Pooh. All the witnesses said something about a red flannel shirt and some sort of cap. Chaboy walked into the police station on his own. Chaboy told Ortiz that appellant pointed a gun at him

9

in a videotaped interview. Nash initially identified appellant on the 19th by describing the red jacket. He did not identify him by name until the 30th. Nash did not implicate appellant until October 16 when he wrote to the District Attorney.

Sanders told him appellant was involved in the murder of Xray. Sanders did not tell Ortiz that appellant said, "Shoot him," but said "Give me that thing." Sanders told Ortiz that the shooter was wearing a doo-rag on his head but Chaboy said there was nothing on the shooter's head.

At trial, appellant testified in his own defense. He admitted to four prior convictions. On July 19th, he was standing at Maple Avenue when he heard a shot fired and saw a man fall. He called 9-1-1. He identified the man as Jody Heard. He talked to police when they arrived and identified himself as the one who called 9-1-1. He talked to Officer Ortiz and was taken into the police station. He was interviewed over a 16-hour period. He did not see Sanders or Nash at the station and he was not asked about Pooh or Chaboy.

During the period around July 19, 2010, he was living in Newhall but came down to the neighborhood of San Julian and 5th Street when he was arrested. He remembered getting into a disagreement with Pooh about a girl, four or five weeks prior to the shooting of Heard. He did not have a confrontation with Chaboy. On July 19, he had come to the area with his girlfriend to buy some "weed" and they were renting a room in the area for the weekend. He had never seen Nash, Chaboy, or Sanders prior to this case. He did not recall seeing Chaboy in jail. Someone came towards him and he tried to defend himself. After he fought with Chaboy they were put into separate "tanks" with plexiglass barriers.

On cross-examination he testified that he saw Chaboy's and Nash's names on the police reports he was given since he was representing himself at the time. He admitted that on July 19, 2010 he was wearing a red and black jacket with a black hat. He admitted being in the area to buy marijuana with his girlfriend and had done so more than 50 times in the past. He said he did not have friends in the area, and they were not people that he sees on a regular basis in that area.

10

The prosecutor then read preliminary hearing testimony from Chaboy about how he knew appellant and Xray. Defense counsel objected to introduction of this testimony because there was a reference to gang membership. The court overruled the objection because the reference to the Hacienda gang related to the issue of identification. Chaboy answered " I know you by your gang." When asked what gang, Chaboy said "From Hacienda Village." At trial, the prosecutor asked appellant where Hacienda Village was, and said he grew up near that area.

The prosecutor then read preliminary hearing testimony from Chaboy wherein he stated he did not report the incident with appellant because "what happens in the streets stays in the streets." The prosecutor asked appellant if he was familiar with the "code of the streets." Appellant said he was familiar with the code, but did not think Chaboy or Nash had "snitched" on him. He saw Nash and Chaboy in the same tank in the courthouse and confronted them for lying.

The prosecutor again asked appellant on cross-examination about what gangs were in the area where he grew up. Defense counsel objected on the grounds of relevance, but the court overruled the objections. Appellant identified several gangs in the area. The prosecutor then asked what kind of gang Hacienda Village was or what they do and defense counsel objected on grounds of speculation and foundation. The court overruled those objections. Appellant identified Hacienda as a "Blood gang."

*DISCUSSION*

*1. Sanders' prior criminal history*

Sanders had two sustained juvenile petitions for selling drugs. During direct examination by the prosecutor, but out of the presence of the jury, defense counsel sought to impeach her with evidence of these prior petitions. The court denied the request, stating, "[A]fter hearing the main thrust of [Sanders'] testimony, I do find that the probative value of utilizing such prior conviction . . . is outweighed by the fact that as a juvenile petition some years back that it would cause confusion to the jury. I am utilizing this in light of the fact that I understand other witnesses are in custody already for other matters. The use of the impeachment is denied." When defense counsel cross-examined

11

Sanders, he asked her if she was drinking the night of the shooting. She said she was not and denied being a "drinker" or a "drug user" "[e]ver."

Defense counsel then renewed his request to impeach her with her prior sustained petitions. The following colloquy occurred: "THE COURT: It's not narcotic sales. Denied. [¶] [DEFENSE COUNSEL]: She has denied using them. I would like to question her. I just thought I would go to sidebar before I did and got in trouble with her. I would like to question her further about her selling them because it just seems to me it's now becoming relevant. [¶] THE COURT: The objection is denied. The question should have been objected to, but it wasn't. But the ruling remains the same."

Appellant contends that the court abused its discretion in refusing to allow the impeachment.

Evidence Code sections 788 and 352 give the trial court discretion to exclude evidence of prior felony convictions when their probative value on credibility is outweighed by the risk of undue prejudice. (*People v. Muldrow* (1988) 202 Cal.App.3d 636, 644.)

Evidence of a witness's past criminal conduct can be admitted to demonstrate the witness's lack of veracity, subject to the discretion of a trial court. (*People v. Wheeler* (1992) 4 Cal.4th 284, 295, superseded by statute on other grounds as stated in *People v. Duran* (2002) 97 Cal.App.4th 284.)

A witness may not be impeached with the fact of a prior juvenile adjudication because it is not a "conviction." Evidence of the underlying conduct, however, is admissible, if the conduct involved moral turpitude. (*People v. Wheeler*, *supra*, 4 Cal.4th 284, 291-292, 295*; People v. Lee* (1994) 28 Cal.App.4th 1724.) Moral turpitude has been defined as a "readiness to do evil." (*People v. Castro* (1985) 38 Cal.3d 301, 314.) The past misconduct involving moral turpitude may suggest a willingness to lie. (*People v. Wheeler, supra,* 4 Cal.4th at pp. 295-296.) Sale of narcotics involves moral turpitude. (*People v. Castro, supra*, 38 Cal.3d at p. 317.)

In determining whether to admit the prior criminal history, the trial court should consider (1) whether the prior conviction reflects adversely on an individual's honesty or

12

veracity; (2) the nearness or remoteness in time of the conviction; (3) whether the prior conviction is for the same or substantially similar conduct to the charged offense; and (4) the effect if the defendant does not testify out of fear of impeachment by the prior convictions. The first factor goes to the admissibility of the prior conviction, which the court must resolve before exercising its discretion based on the remaining factors. (*People v. Green* (1995) 34 Cal.App.4th 165, 182-183, citing *People v. Beagle* (1972) 6 Cal.3d 441.)

"On appeal, the trial court's discretion is reviewed for abuse of discretion. . . . In most instances, the appellate courts will uphold the exercise of discretion even if another court might have ruled otherwise." (*People v. Feaster* (2002) 102 Cal.App.4th 1084, citing *People v. Clair* (1992) 2 Cal.4th 629, 655.) The trial court has broad discretion in deciding whether to admit acts of moral turpitude. (*People v. Doolin* (2009) 45 Cal.4th 390, 442-443.) We cannot interfere with the trial court's exercise of discretion unless it was clearly abused. (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65-66.)

The record reveals the trial court carefully considered the evidence under Evidence Code section 352 but concluded that its probative value did not outweigh the danger of undue prejudice.

Initially we note, as the trial court did, that Sanders denied using drugs, but her prior adjudications were for selling drugs. However, even if evidence of her past history were admitted, we find that any mention of them would not have affected the weight of her testimony. Sanders told police the same version of the incident as Chaboy and Nash. All of their descriptions pointed to a man wearing red whom they recognized as a gang member who frequented the area.

Due to the fact that the witnesses and victims all lived in the area which was known for narcotics sales, the fact of Sanders' prior narcotics sales activity should not have surprised anyone. As the trial court noted, "other witnesses are in custody already for other matters." Nash admitted he had a prior criminal history, including narcotic related convictions, and admitted he was in custody and on psychotropic medications at the time of trial. Chaboy was in custody on a narcotics charge. Nash described Chaboy

13

as a known drug dealer and said appellant was angry that Chaboy was selling drugs in his territory. Appellant admitted to drug use. Any evidence that Sanders was also selling drugs would not have outweighed the striking similarities in the descriptions of the assault. Any error in excluding the evidence was harmless. (*People v. Feaster, supra,* 102 Cal.App.4th at p. 1094.)

Appellant also contends that his federal constitutional right to confrontation (Sixth and Fourteenth Amendments to the U.S. Constitution) was violated when the trial court did not allow counsel to impeach Sanders. He then argues that if he is prevented from raising these claims on appeal because his counsel did not object at trial on federal constitutional grounds, then he is entitled to claim ineffective assistance of counsel.

To show a deprivation of federal due process rights, appellant must show that the erroneous admission of evidence resulted in an unfair and arbitrary trial. (*People v. Albarran* (2007) 149 Cal.App.4th 219, 229.) Since we have found that any error in the court's refusal to allow impeachment of Sanders was harmless, we find no violation of appellant's federal Constitutional rights. (*People v. Castro, supra,* 38 Cal.3d at p. 317.) There was no ineffective assistance of counsel due to appellant's counsel's failure to object on federal constitutional grounds.[5] We are not persuaded that a more favorable verdict would have occurred even if the impeachment evidence were admitted. (*People v. Cudjo* (1993) 6 Cal.4th 585, 634-635; *People v. Nguyen* (1995) 40 Cal.App.4th 28, 36-37, fn. 2.)

*2. Gang evidence*

Prior to trial, there was a discussion between counsel over the use of the police field identification cards to show appellant's gang affiliation. The prosecutor stated she would only introduce gang evidence to the extent it had to deal with the circumstances of the robbery and assault.

---

[5]    Appellant's claims of other incidents of ineffective assistance of counsel are discussed in Section 4, *infra*.

14

Halfway during trial, defense counsel requested a bench conference in which he stated that the Deputy District Attorney had just given him an arrest report for appellant which indicated that appellant was an active gang member for Hacienda Village Bloods. Defense counsel said he had previously been under the impression that there was no documentation of appellant's gang membership. The prosecutor stated that he[6] was not planning on introducing any sort of formal gang evidence, but when defense counsel had "pushed and prodded" for evidence of appellant's gang affiliation, he asked Officer Ortiz to investigate it, and the officer came up with the report. The prosecutor stated "At this point I don't intend on using any of it in my case in chief." Defense counsel said that if appellant testified he was not a member of a gang, he could be impeached with that information, and requested time to investigate. The court granted him the rest of the following day after the prosecution rested.

In this trial, there was no gang expert called as a witness and no gang allegation against appellant.

As indicated previously, Sanders, Nash and Chaboy all referred to appellant as a gang member. They testified that he referred to the man on the bike as a "brother" or a "Blood" and that appellant used the word "Blood" just before the Chaboy shooting. Appellant contends that these multiple references to gang membership were irrelevant and inflammatory. Appellant also contends the court erred by allowing the prosecutor to elicit irrelevant and inflammatory evidence about the Hacienda gang from the witnesses and from appellant on cross-examination.

Gang evidence is admissible when it is relevant to motive, intent, identity and modus operandi. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049; *People v. Martin* (1994) 23 Cal.App.4th 76, 81.) Gang evidence should not be admitted if it is only admitted to prove a criminal disposition or if it is tangentially relevant and will have a

---

[6]     A different Deputy District Attorney appeared on behalf of the People during trial.

15

highly inflammatory impact.  (*People v. Williams* (1997) 16 Cal.4th 153, 193; *People v. Ruiz* (1998) 62 Cal.App.4th 234, 240.)

We review the admission of gang evidence for abuse of discretion.  *(People v. Carter* (2003) 30 Cal.4th 1166, 1194.)  A trial court abuses its discretion when it exceeds the bounds of reason, all of the circumstances being considered. (*People v. Giminez* (1975) 14 Cal.3d 68, 72.)

The evidence that appellant had gang ties was relevant to the issues of identification and motive.  Appellant's defense was an alibi, that he was not at the scene.  Chaboy, Sanders, and Nash identified appellant by his gang, and said he was known in the neighborhood.  Sanders and Nash heard appellant identify himself as a "Blood."  According to Nash and Sanders, appellant's motive for assaulting Chaboy was interference with appellant's narcotics sales territory.  While this was not a gang dispute, appellant called on someone whom he referred to as a "brother" to assist in the confrontation.  Appellant admitted he grew up in the Hacienda Village neighborhood, corroborating identity.

The gang evidence was also relevant because it explains why Nash did not tell police what he saw and testified in disguise at the preliminary hearing and why Chaboy completely recanted his eyewitness account at trial.  In order to explain why the shooting took place, and to tie in the varying witness accounts, the prosecution was entitled to demonstrate that appellant was an alleged gang member. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167-1168.)

Any abuse of discretion in admitting gang evidence was harmless in light of the eyewitness accounts identifying appellant as someone the witnesses all knew and the consistent descriptions of him wearing a red shirt.  Here, in contrast to the cases cited by appellant, *People v. Albarran, supra,* 149 Cal.App.4th 219 and *People v. Bojorquez* (2002) 104 Cal.App.4th 335, the challenged evidence had direct relevance to and was directly probative of the charges against appellant.  Moreover, we find no reasonable likelihood that the jury's passions were inflamed by the evidence of gangs.  Under the harmless error standard of review, the outcome of the trial could not have been more

favorable to appellant had the gang evidence been excluded.  (*People v. Fields* (2009) 175 Cal.App.4th 1001, 1018.)

*3.  Prosecutorial misconduct*

Appellant contends the prosecutor committed misconduct by eliciting prejudicial gang evidence during cross-examination of appellant, and during closing argument, arguing facts not in evidence.  Upon questioning by the prosecutor, appellant testified he lived in the same neighborhood as Hacienda gang territory and named several other gangs in the neighborhood.  Several of the gangs he named had the word "Crips" in their name.  Appellant then testified that Hacienda Village was a Blood gang, but appellant never admitted he was a member of that gang, nor was he asked about his affiliation.  Counsel argued in closing: "And what are the odds that the defendant happened to know or seemed to know.  I don't know whether it's true or not, whether he was correct, happened to know, exactly what the gangs there were [in] that area and who their rivals were."  In addition, the prosecutor argued, "How else would all the fingers point at the Hacienda Blood, the guy who identified himself as such, and just so happens to be wearing red and just so happens to have grown up in the area in which that gang frequents?"  Appellant contends that the prosecutor was improperly appealing to the jurors' emotions and fear.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.'  (*People v. Morales* (2001) 25 Cal.4th 34, 44, . . .)  In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial,'  (*United States v. Agurs* (1976) 427 U.S. 97, 108. . . .)"  (*People v. Coffman* (2004) 34 Cal. 4th 1, 92.)  A prosecutor's conduct violates California law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.  (*Ibid.*)

Appellant did not object to any statements in closing argument nor did he request an admonition from the court.  Appellant has therefore forfeited this issue on appeal.  (*People v. Coffman, supra,* 34 Cal.4th at p. 100.)

17

In any event, we have determined that the gang references were admissible due to their relevance to identity and therefore, the prosecutor did not commit misconduct when eliciting evidence with gang references.

A prosecutor enjoys wide latitude in commenting on the evidence, including urging the jury to make reasonable inferences and conclusion therefrom. (*People v. Tafoya* (2007) 42 Cal.4th 147, 179.) In our view the challenged comments fell within the permitted range of fair comment on the evidence. Appellant was repeatedly identified as a gang member by three eyewitnesses. He lived in the same neighborhood as the gang they identified. The prosecutor was drawing a fair inference from this testimony. The statement about rivals was also a logical conclusion from his testimony that some of the gangs in the neighborhood were Crips and the Hacienda gang was a "Blood gang." There was no reasonable likelihood any juror would have applied the prosecutor's comments erroneously. We conclude any misconduct was harmless, given the fleeting nature of the comment and the overwhelming weight of the evidence against appellant. (*People v. Huggins* (2006) 38 Cal.4th 175, 252-253.)

*4. Ineffective assistance of Counsel*

Appellant contends that he received ineffective assistance of counsel because his trial counsel made promises in opening statement that he would establish appellant was not a gang member and then failed to provide that evidence, because his counsel failed to request exclusion of gang evidence under Evidence Code section 352 and because his trial counsel elicited prejudicial evidence when cross-examining Nash which portrayed appellant as a vicious murdering gang member.

To establish ineffective assistance, appellant must show that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. Next he must establish that absent counsel's error, it is reasonably probably that the verdict would have been more favorable to him. (*People v. Gray* (2005) 37 Cal.4th 168, 206-207; *In re Fields* (1990) 51 Cal.3d 1063, 1069-1070.) On appeal, the court defers to reasonable tactical decisions made by counsel. If the record on appeal does not reveal why counsel acted in the manner challenged, we reject the claim

of ineffective assistance unless counsel was asked for an explanation and failed to provide one. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.)

In his opening statement, defense counsel told the jury that some of the witnesses would make statements about appellant being a gang member. He continued, "Whoever may or may not have done these things, apparently, represented themselves as a Hacienda Village Blood. The problem is that [Officer Ortiz ] will tell you that it's not so. [Appellant] has never been a Hacienda Village Blood or any other. He is not any gang 'Blood.'"

At trial, appellant never admitted being a Hacienda Blood gang member. He merely testified that he grew up in the area and knew which gangs were in that area. Officer Ortiz never testified that he knew appellant to be a Hacienda Blood member. The statements defense counsel made were consistent with the defense of mistaken identity in the face of conflicting evidence from the prosecution witness. Defense counsel may have been making a tactical decision to meet the gang evidence head on, since he knew that various witnesses had referred to appellant by his gang membership in videotaped police interviews.

Since it was a reasonable inference that counsel made a tactical decision to address the gang evidence, and the record does not suggest that counsel failed to provide an explanation about this decision when asked, the ineffective assistance claim must be rejected. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1058.) In addition, appellant failed to demonstrate a reasonable probability the outcome of the trial would be different absent the alleged errors. Three eyewitnesses described the assault on Chaboy and identified appellant. Chaboy and Nash gave consistent versions about the confrontation in the holding cell.

With respect to the gang evidence elicited from witnesses, as we have discussed, the gang evidence was relevant to the issue of identity. The trial court did rule that the evidence was relevant, prior to and during trial. Any objection to the introduction of this evidence would have been futile. (*People v. Waidla* (2000) 22 Cal.4th 690, 719.)

19

*5. Cumulative Error*

Appellant claims that the cumulative effect of the errors requires reversal. We do not agree. The alleged errors did not affect the process nor did they accrue to his detriment. (*People v. Sanders* (1995) 11 Cal.4th 475, 565; *People v. Osband* (1996) 13 Cal.4th 622, 688.)

*DISPOSITION*

The judgment is affirmed.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**

**ZELON, J.**

20