Filed 5/18/16  P. v. Moore CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069453 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1204664) |
| ULYSSES FRANKLIN MOORE, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Rafael Arreola, Judge.  (Retired Judge of the San Diego Super. Ct., assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Ulysses Franklin Moore, Jr., of unlawfully possessing a firearm (Pen. Code, § 29800, subd. (a)(1);[1] count 3.) The jury was unable to reach a verdict on counts 1 (robbery; § 211) and 2 (unlawfully possessing a firearm; § 29800, subd. (a)(1)). The trial court thus declared a mistrial as to those counts.

After a retrial as to counts 1 and 2, the jury convicted Moore of both counts. The jury also found true that Moore personally used a firearm during the commission of a robbery (§§ 12022.53, subd. (b) & 1192.7, subd. (c)(8)), and Moore committed the robbery for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)). In a bifurcated proceeding, the trial court found true that Moore has suffered two prior prison terms (§ 667.5, subd. (b)), a serious prior felony (§ 667, subd. (a)), and a prior strike conviction (§ 667, subds. (c) and (e)(1)).

The court sentenced Moore to prison for 31 years.

Moore appeals, contending (1) his Sixth Amendment rights were violated when the prosecution's expert witness relied on hearsay evidence to testify about the gang allegation; (2) his Sixth and Fourteenth Amendment rights were violated by the trial court's limitation regarding the scope of the cross-examination of the prosecution's expert witness; and (3) the trial court erred in not allowing Moore to present evidence of his postarrest accomplishments. We affirm.

---

[1] Statutory references are to the Penal Code unless otherwise specified.

2

FACTUAL BACKGROUND

Prosecution

On December 8, 2012, at about 4:30 p.m., Michael Green was walking on La Rue Street in Jurupa Valley to the high school library after which, he planned to go to a Metro PCS store. On the way to the library, a van pulled up and stopped on the other side of the street. Moore got out of the van and approached Green with a gun pointed at him. Moore ordered Green to empty his pockets. Moore stole Green's two cell phones, his ear buds, sunglasses, and a gold chain with a cross pendant. Moore then told Green that he was from Rubidoux Project Crip[s] and to get out of his "hood." Moore was wearing a baseball cap with a "J" on it.

After the van drove away, Green went home and called the police. He described the van as a grayish or greenish minivan with license plate number 4XF2699. At trial, Green said he thought the suspect was between six feet three inches and six feet five inches tall.[2]

On December 17, 2012, Green saw Moore at a gas station. Green approached Moore and accused him of being the man who robbed him. Green was carrying a sawed-off pellet gun in his backpack at the time and was prepared to defend himself with it. Moore became hostile and, when Moore reached into his back pocket, Green ran back into the store and called 911.

---

[2]     At Moore's first trial, Green testified that the perpetrator was about six feet tall.

3

Riverside County Sheriff's Deputy Heath Noyes located Moore at a gas station a few blocks away. Before Moore got out of the van, Noyes could see him leaning toward the passenger seat. Underneath the front passenger seat of the van, deputies found a black semiautomatic handgun. They also found a Toronto Blue Jays hat in the van. During an in-field line-up and at trial, Green identified Moore as the person who robbed him on December 8.

The parties stipulated that on February 28, 2011, Moore was convicted of a felony and prohibited from possessing a firearm.

Riverside County Sheriff's Deputy Bryce Holmes testified as the gang expert. He explained that West Side Project Crips is a criminal street gang that also is called Rubidoux Project Crips. The gang is located in Jurupa Valley and operates in four neighborhoods: the Estates, the Projects, Belltown, and Okie Town. The gang's common symbols include the initials "PJ" or "J," its color is blue, and gang members often wear Toronto Blue Jays clothing.

In December 2012, the gang had about 100 members. The primary activities of West Side Project Crips were robbery, burglary, drug sales, assaults, batteries, and homicides.

Holmes discussed three predicate offenses committed by West Side Project Crips gang members. On December 15, 2009, gang members Maurice Whitley and Tyrale Holley committed robbery and assault. On October 11, 2010, gang members Abe Tillard and Daymen Tolbert committed assault with a deadly weapon with gang allegations.

4

And, on August 30, 2011, gang members Daniel Green, Dwayne Brady, and Tolbert committed attempted robbery with gang allegations.

Holmes opined that Moore was a West Side Project Crips gang member. Holmes based his opinion on his prior contacts with Moore. Moore's nicknames are Pee Wee and Boogieman. Moore frequented the gang's area and affiliated with other gang members. He had been in the gang for over 20 years. Moore's gang tattoos include "WS" on his chest, and "Rubidoux" across his back with a "29" over the "I," which stands for 29th Street, where the gang started. Moore also has "BT" on his arms, for Belltown, and "Product of Riverside" also on his chest. On Moore's left arm one tattoo says, "Nobody Moves" with a picture of a gun, and on his right arm another tattoo says "Nobody Gets Hurt" with a picture of a gun.

Holmes testified that Moore was known as an enforcer in the gang because he disciplined younger gang members and they were afraid of him. At a trial in July 2012, Holmes saw Moore with other active members of West Side Project Crips sitting in the audience. During a break, Moore said to Holmes, "You can't leave us PJs alone, can you."

Holmes explained the importance of respect and reputation in gangs. He opined that the robbery in this case was committed for the benefit of a criminal street gang because it boosted the gang's reputation and placed fear and intimidation in the community and as to rival gangs.

Defense

Moore's defense at trial was alibi and misidentification. Moore and his girlfriend Mzimi Gunder were staying at James Williams, Jr.'s, apartment in Redlands on December 8, 2012. Williams testified that on December 8, Moore took him to cash a check and then to the store. They left Williams's apartment at 9:30 a.m. They returned to Williams's apartment about noon or 1:00 p.m. Moore and Gunder left about 1:00 or 2:00 p.m., and returned to the apartment about 5:00 or 6:00 p.m. Moore and Gunder were using the same van that day that Moore was in when he was arrested. It belonged to an older woman in the neighborhood, Ms. Marlene, whom the couple helped look after. Williams did not see Moore with any of the items taken from Green. Moore's demeanor that day was quiet and low key.

Gunder testified that she and Moore had been dating for 10 years, and confirmed she was with him and Williams on December 8. When they left Williams's apartment in Redlands that afternoon, they drove to Riverside and picked up mail from Ms. Marlene's house, visited Moore's father, who was ill, in Belltown, then returned to Redlands. She was vaguely aware of somebody coming to Moore's father's apartment and borrowing the van for an hour or so. After the van was returned, Moore and Gunder drove back to Redlands, but did not drive through the area where the robbery occurred.

Moore testified in his defense. He confirmed the events of December 8 as described by Gunder and Williams. He said that several younger acquaintances came to his father's apartment while he and Gunder were there, and asked for a ride to an auto parts store. Moore told them to take the van and to come right back. They were gone 30

to 40 minutes and, when they returned, one of them, Riley Edwards, was carrying a bag and had supposedly purchased items to work on his car. Moore described Edwards as being six feet or six feet one inches tall and having a medium build. Not long after the men returned the van, Moore and Gunder left to go back to Redlands. Moore said he was 6 feet eight or six feet nine inches tall and, that in December of 2012, he weighed about 280 pounds. He was 36 years old at the time of the charged offenses.

On December 17, Moore stopped at his brother's house on the way to the library with Williams. Guadalupe Perez, whom Moore had been "messing around" with, was there, and wanted to talk to him. Moore was trying to avoid her because he was in a relationship with Gunder, but she followed him to the library.

Moore told Perez she could talk to him while he got Gunder a soft drink at the convenience store, which was right by the library. She jumped in the van, and waited while Moore went into the store. On his way out of the store, Green, whom Moore did not know, stuck a black duffel bag in Moore's ribs, and Moore saw a sawed-off handle sticking out of the bag. Green asked Moore how did it feel to be robbed, and said he recognized Moore because of the van. Moore said it was not his van, and Green said he did not care, that he wanted his stuff back, or what was in Moore's pockets. Moore said he told Green to shoot him in the back if he was going to shoot, and he walked away with his hands up. Perez had gotten out of the van, and was running around yelling for someone to call 911. She and Moore both got back into the van, and Moore drove across the street to a parking lot, and they sat there for a few minutes. When the police arrived, Perez insisted that they go back, so they did, and she told officers that Green was the

7

person who just tried to rob them. They told her to shut up, so Perez got back in the van. They saw officers putting handcuffs on Green, and Moore drove away. Nobody was looking for him at that point because the police responded to a call about the robbery being committed by Green.

Moore took Perez home, and headed back to Williams's apartment to give Gunder her soft drink before going to pick up Williams at the library. He was pulled over after making a left turn on 30th Street. Moore said the officer "went through the motions" with the lights and guns, and he told the officer he was glad to see him since someone had just tried to rob him. Instead of listening to his explanation, Moore was detained, and had a spotlight put on him for Green's identification. Moore had never handled the gun found in the van, and saw it for the first time when the officer brought it out of the van.

## DISCUSSION

## I

### *GANG EVIDENCE*

#### A. Moore's Contention

Moore insists the trial court erred when it overruled certain hearsay objections to evidence relied upon and testified to by Holmes. He argues that the challenged evidence was testimonial, and thus, his Sixth Amendment confrontation rights were violated. We conclude that Moore forfeited this issue.

#### B. Background

During Holmes's testimony at the second trial, the prosecutor provided him with law enforcement documents evidencing prior convictions involving West Side Project

8

Crips gang members. After the prosecutor gave Holmes an exhibit relating to one such case (No. RIF154644), she asked Holmes what happened in that case. Moore's trial counsel objected on hearsay grounds. The court then asked the prosecutor if the evidence was being offered "for the truth of the matter asserted" or "to establish the expertise and knowledge and elements of being a gang member?" The prosecutor replied it was the latter. The court then overruled the objection, subject to a motion to strike, and admonished the jury that the court was only admitting the testimony for the limited purpose of showing "whether or not a person qualifies as a gang member, whether or not a particular gang qualifies as—as a street gang. [¶] You can't consider it for the truth. We are not trying that case."

Holmes then testified about case No. RIF154644. He also testified about two other cases without objection by Moore's trial counsel in forming his opinion that the West Side Project Crips is a criminal street gang.

After asking Holmes if he was familiar with field identification cards, the prosecutor handed Holmes an exhibit consisting of three field identification cards. Holmes said that he recognized the cards, and the prosecutor asked to publish the cards for the jury. At that point, Moore's trial counsel objected to them being published to the jury, but did not state the basis of his objection. In response to the objection, the court asked the prosecutor to "[l]ay a further foundation if you want to show it to the jury[.]" The prosecutor proceeded to lay additional foundation and then asked what information was on one of the cards concerning Moore. Defense counsel objected to the question on hearsay grounds. The court ruled:

9

"Well, it may or may not be. I'll allow it for the limited purpose of showing gang membership with gang activity. But you want to lay further foundation as to who took them, if this is the witness who actually took the information. Lay a further foundation as to that."

Holmes testified about three different field identification cards. Two of those cards were prepared by Holmes's former partner after Holmes and his partner interviewed Moore. Holmes prepared the other field identification card. Holmes testified about the content of the cards without any further objection from Moore's trial counsel.

During cross-examination of Holmes, Moore's trial counsel briefly addressed the content of the field identification cards, including questions about the cards prepared by Holmes's partner.

### C. Analysis

As Moore notes, currently pending before the California Supreme Court are multiple cases involving whether a gang expert's reliance on testimonial hearsay violates a defendant's Sixth Amendment confrontation rights as set forth in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). (See *People v. Sanchez* (2014) 223 Cal.App.4th 1, review granted May 14, 2014, S216681; *People v. Archuleta* (2014) 225 Cal.App.4th 527, review granted June 11, 2014, S218640.) We need not address the issue because we conclude that Moore has forfeited his challenge here.

Attempting to avoid forfeiture, Moore contends his hearsay objection preserved the Sixth Amendment claim now raised. To support his position, Moore cites *People v. Cowan* (2010) 50 Cal.4th 401, 503 (*Cowan*). Moore's reliance on *Cowan* is misplaced.

10

In *Cowan*, the court did not hold that a hearsay objection preserves a Sixth Amendment challenge on appeal. In that case, the court assumed that the confrontation clause claim was preserved when the defendant's counsel made a hearsay objection. (*Cowan*, *supra*, 50 Cal.4th at p. 503.) As such, *Cowan* does not mandate that we find Moore's hearsay objection preserved his Sixth Amendment challenge. Instead, in light of the record before us, we find his claim forfeited for lack of a timely and specific Sixth Amendment objection. (Evid. Code, § 353, subd. (a); see *People v. Burgener* (2003) 29 Cal.4th 833, 869 [hearsay objection did not preserve confrontation clause claim]; *People v. Chaney* (2007) 148 Cal.App.4th 772, 779-780 ["A *Crawford* [i.e., confrontation clause] analysis is distinctly different than that of a generalized hearsay problem"; issue forfeited].)

The record on Moore's Sixth Amendment confrontation claim is underdeveloped. Moore's trial counsel did not argue this issue at trial, and the prosecutor was not given the opportunity to respond to any such argument. The trial court was not able to completely consider the issue beyond a hearsay objection, but also left open the possibility for additional objections or a subsequent motion to strike. Defense counsel never mentioned the Sixth Amendment and did not claim that the admission of the evidence violated Moore's right to confront witnesses against him.

The Sixth Amendment guarantees the accused in criminal prosecutions the right "to be confronted with the witnesses against him [or her]." In *Crawford*, the United States Supreme Court held that this provision prohibits the admission of testimonial hearsay unless the witness is unavailable or there was a prior opportunity for cross-

11

examination. (*Crawford, supra,* 541 U.S. at p. 68.) The court did not provide a definition of " 'testimonial' statements" but noted that there were "[v]arious formulations" of the term, including: " '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' [citation]." (*Id*. at pp. 51-52; see also *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 310.)

The United States Supreme Court also declined to "attempt[ ] to produce an exhaustive classification" of testimonial statements in *Davis v. Washington* (2006) 547 U.S. 813, 822. The court did explain the difference between testimonial and nontestimonial statements made to the police: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id*. at p. 822, fn. omitted; see *Michigan v. Bryant* (2011) 562 U.S. 344, 349.)

12

Here, it is not clear from the record the extent to which Holmes was relying on testimonial hearsay to develop his opinions. For example, defense counsel objected on hearsay grounds when Holmes began to testify about the first of three prior convictions of West Side Project Crips. The record implies that he was basing his testimony on the records of prior convictions of gang members. If that is the case, those records do not necessarily constitute testimonial hearsay. (See *People v. Taulton* (2005) 129 Cal.App.4th 1218, 1225; *People v. Perez* (2011) 195 Cal.App.4th 801, 804.) Yet, as Moore's trial counsel did not object on Sixth Amendment grounds as to Holmes's testimony, the record is unclear regarding the basis of Holmes's testimony. This omission deprived the trial court the opportunity to consider this issue. Further, if the trial court had found that evidence was testimonial hearsay, the prosecutor could have called additional witnesses to testify as to the previous convictions. Because defense counsel did not make a specific Sixth Amendment objection, we are left to guess about these critical issues on appeal. Thus, a forfeiture finding is appropriate.

The field interview cards also illustrate the record's shortcomings. After Moore's trial counsel objected to Holmes testifying as to the contents of the cards, the court stated that the cards might be hearsay, but admitted them for the limited purpose of showing gang membership and suggested that the prosecutor should lay additional foundation. After the prosecution did so, Holmes then testified as to the content of the cards, but defense counsel did not object to the testimony on hearsay or Sixth Amendment grounds. Holmes prepared one of the cards and the other two were prepared by Holmes's partner. And Moore's trial counsel even cross-examined Holmes about the content of the cards.

13

On this record, we simply cannot find that Moore's Sixth Amendment challenge to the evidence was preserved.[3]  Therefore, we conclude that Moore has forfeited his Sixth Amendment challenge as to the alleged hearsay evidence relied upon and testified about by Holmes.

II

*SCOPE OF CROSS-EXAMINATION*

A.  Moore's Contention

Moore contends his Sixth and Fourteenth Amendment rights were violated when the trial judge would not allow Moore's trial counsel to ask certain questions probing Holmes's bias against Moore.  We do not share Moore's characterization of the trial court's limitation of the cross-examination of Holmes.  Instead, we view the trial court's limitation as an appropriate use of discretion in limiting the evidence at trial under Evidence Code section 352.  We thus reject Moore's contention that his counsel's limited cross-examination of Holmes violated a constitutional right or the trial judge's limits on the cross-examination constituted error.

---

[3]    Moore also maintains that the court improperly overruled certain hearsay objections in the first trial.  The citations to the record provided by Moore, however, show the trial court sustaining certain objections and defense counsel asking for a limiting instruction if the evidence was being offered for the basis of the expert's opinion. The hearsay objection the trial court overruled involved a statement Moore made to an officer.  Clearly we cannot say that Moore preserved a Sixth Amendment objection based on that record.

14

B.  Background

During trial, the prosecutor told the court that she believed that Moore's trial counsel intended to question Holmes about a 2010 trial where he testified against Moore. That case resulted in a hung jury, but Moore eventually pled guilty.  The prosecutor argued that the testimony was not relevant.

Moore's trial counsel responded that he wanted to ask Holmes about the prior case to show he was biased against Moore because his testimony resulted in a failed prosecution.  The court questioned defense counsel regarding how such testimony would show bias, noting that officers like Moore "testify 40, 50, 100 times[.]"  Counsel stressed that the previous case was against Moore and the result was a hung jury.  The court was not persuaded and observed, "But just because he testified and it ended being a hung jury, that's not relevant to this case."

The prosecutor also offered that the previous case was not a failed prosecution because Moore ultimately pled guilty.  In addition, the prosecutor stated that, unlike the current case, there were no gang violations in the previous case.  The court ultimately ruled:

> "Yeah.  Well, I don't see the relevance.  Even if it had some relevance, testifying in a previous trial and the person being—or the jury being hung, it's—I don't see the relevance.  But even if there was, I'm not going to open the door to that as to what happened— what happened ultimately, whether they pled guilty or not, and so on.  So, under [Evidence Code section] 352, I would keep it out anyway.

15

C. Analysis

Although Moore frames his argument in constitutional terms, the logical starting point for our analysis is the statutory rule set forth in Evidence Code section 352. Under that provision, " 'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' '[A] trial court's exercise of discretion under [that section] will not be reversed on appeal absent a clear showing of abuse[,]' meaning that " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.]' [Citation.]" (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1457.)

Further, a trial court has a duty "to control all proceedings during trial . . . with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." (§ 1044.) It also has broad discretion to control the mode of witness examination (Evid. Code, § 765, subd. (a)), and to determine the relevance of evidence and weigh the prejudicial effect of evidence against its probative value. (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1385.) The trial court's authority under Evidence Code section 352 includes the "discretion to admit or exclude evidence offered for impeachment." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9.) In fact, " '[t]he latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' " (*People v. Ayala*

16

(2000) 23 Cal.4th 225, 301.) We review a trial court's evidentiary rulings and rulings regarding order of proof for abuse of discretion. (*People v. Tafoya* (2007) 42 Cal.4th 147, 175.)

Nevertheless, it is well established that the defendant in a criminal trial must be afforded certain rights to ensure the basic fairness of the proceedings. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, [citation], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " (*Crane v. Kentucky* (1986) 476 U.S. 683, 690.) Under these constitutional provisions, "the defendant in a criminal prosecution [has] the right of cross-examination, which includes exploration of bias." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 349.)

Yet, these rights only pertain to "relevant and material" evidence. (*Washington v. Texas* (1967) 388 U.S. 14, 23.) Evidence lacking significant probative value may properly be excluded without offending the constitution. (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.) As the United States Supreme Court has explained, the confrontation clause "guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (*Delaware v. Fensterer* (1985) 474 U.S. 15, 20, italics omitted.) Unlimited inquiry into collateral matters is not permitted. (*People v. Jennings* (1991) 53 Cal.3d 334, 372.)

Here, Moore's trial counsel was not prohibited from probing Holmes's bias against Moore, except that the trial court would not allow him to question Holmes about a case in

which Holmes testified against Moore in 2010. The trial court expressed doubt whether such evidence would show bias and implied that it was not relevant. Moore argues on appeal that the evidence would have shown bias because the result of the trial was a hung jury. He reasons that because Holmes's prior testimony resulted in a "failed prosecution," he would be more likely to embellish or fabricate to secure a conviction in the instant matter. In addition, Moore contends that the line of questioning would not have consumed an undue amount of time, taking mere "minutes." We disagree.

As an initial matter, we observe that the record does not support Moore's position regarding the previous matter in which Holmes testified. Although the jury hung, Moore ultimately pled guilty. As such, it is not correct to refer to this 2010 case as a failed prosecution.

Further, there is some question in the record whether the previous case concerned gang allegations. Moore's trial counsel represented to the court that it did while the prosecutor countered that it did not. This issue was not resolved on the record.

Against this backdrop, we share the trial court's concerns about the relevancy of Moore's purported line of questioning. And contrary to Moore's argument, to simply establish the possibility of relevancy that the purported evidence would go to Holmes's bias against Moore, significantly more than a few minutes of questioning would be needed. To provide context, foundation would have to be laid to explain the previous charges against Moore, the nature of Holmes's testimony, other evidence for and against Moore, and possible explanations for the jury being unable to reach a verdict. Moreover, Moore ultimately pled guilty and the jury would hear about a previous offense that has no

18

relationship to the instant matter. In other words, simply to establish the basis to allow the jury to ascertain whether Holmes could be biased against Moore because of the 2010 trial would involve a mini-trial in and of itself. This is precisely the type of undue consumption of time Evidence Code section 352 was meant to address and the court was well within its discretion to limit Holmes's cross-examination on these grounds. One of the purposes of Evidence Code section 352 is to "prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*People v. Wheeler* (1992) 4 Cal.4th 284, 296.)

In addition, we determine there was no violation of Moore's right to present his defense or cross-examine witnesses. "As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' " (*People v. Fudge* (1994) 7 Ca1.4th 1075, 1102-1103.) Unless the defendant can show the proposed cross-examination would have produced a significantly different impression of the witness's credibility, the trial court's exercise of its discretion in this regard will not be deemed to have violated the defendant's confrontation rights. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680; *People v. Frye* (1998) 18 Cal.4th 894, 946.) No Sixth Amendment violation will be found if the jury is exposed to the essential facts from which it could appropriately draw inferences relating to the reliability of the witness. (*Davis v. Alaska* (1974) 415 U.S. 308, 318.) Simply put, on the record before us, Moore has not carried his burden in showing the proposed topic during Holmes's cross-examination would have produced a significantly different impression for the jury. There was no error or constitutional violation here.

19

## III

### *MOORE'S EVIDENCE OF POSTCRIME ACCOMPLISHMENTS WHILE IN CUSTODY*

#### A.  Moore's Contention

Lastly, Moore argues that the trial court's exclusion of evidence of Moore's postarrest accomplishments while incarcerated violated his right to defend himself against the charges within the meaning of the Fifth, Sixth, and Fourteenth Amendments. We disagree.

#### B.  Background

Prior to Moore testifying, the prosecutor told the court that defense counsel "may try to introduce some achievement awards from Mr. Moore's stay in custody post his arrest in this case.  These achievement awards are for books he read, classes he took, and poems he wrote.  But I don't believe any of that is relevant."

Moore's trial counsel disagreed, arguing the evidence shows that Moore "moved away from the gang life.  Rather than being some type of enforcer or tough guy in the County jail, he's spending time studying" various subjects.  Defense counsel further characterized Moore's postarrest actions as "things that you really wouldn't expect to see someone who is a gang member doing."  Moore's trial counsel reasoned that the evidence "suggest[ed] strongly" that Moore had "walked away from the gang life and was no longer a gang member as of December 8th, 2012."

The court was not persuaded by defense counsel's argument:

> "How is getting certificates after the fact going to prove that he's not [a gang member]?  We don't have any expert testimony saying

that gang members never study, never read, never do chemistry, never achieve anything. . . . [¶] You know, I can tell you some have come out in the community and become leaders and so on, but that doesn't mean they didn't do the crime. So I don't see the relevance of it. [¶] One exception. If the prosecution asks him questions and they allege or argue in some way that he's still committing crimes or he's still doing it after this incident and they try to impeach him with that, then they may be relevant to rehabilitate on that. But I don't see how any degrees or certificates that he got after the incident prove that he didn't do anything or that he wasn't a gang member at the time of the incident. [¶] So the objection is sustained. Those certificates will not come in without prejudice to reconsider if he's impeached as to his current—if the People argue that he currently is an active enforcer of the gang or he calls the shots from jail. And I understand sometimes people call the shots from prison. Then they may be relevant to rehabilitate him as to not being a shot caller or the one that makes decisions and people are out there committing crimes on his behalf. Okay."

Ultimately, the certificates of Moore's postarrest achievements were not admitted into evidence at Moore's second trial. Moore notes, however, that the certificates were admitted at his first trial, and he testified in that trial that he was not an active gang member in December 2012. Moore emphasizes that the jury did not reach a verdict on two of the charged counts in his first trial.

## C. Analysis

Here, Moore claims the evidence of certificates and/or awards post arrest was admissible character evidence under Evidence Code section 1102. Consequently, he argues the court erred in excluding this evidence. We review a trial court's rulings on the admission and exclusion of evidence under the abuse of discretion standard. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113.) We conclude that the trial court did not abuse its discretion.

21

Character evidence may take the form of an opinion, evidence of reputation, or specific acts of the person's conduct. (Evid. Code, § 1100.) Evidence Code section 1101, subdivision (a) establishes a general rule that character evidence, in all its forms, is inadmissible to prove a person's conduct on a specific occasion. (*People v. McFarland* (2000) 78 Cal.App.4th 489, 493.) This general rule is subject to several statutory exceptions, including exceptions set forth in Evidence Code sections 1101, subdivision (b) and 1102. (Evid. Code, § 1101, subd. (a).)

Evidence Code section 1102 applies to criminal actions and allows the admission of opinion and reputation evidence under certain circumstances, but the statute does not provide for the admission of specific acts evidence under any circumstances. (*People v. Felix* (1999) 70 Cal.App.4th 426, 431 (*Felix*), citing *People v. Wagner* (1975) 13 Cal.3d 612, 618-619.) The statute provides: "In a criminal action, evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation is not made inadmissible by Section 1101 if such evidence is: [¶] (a) Offered by the defendant to prove his conduct in conformity with such character or trait of character. [¶] (b) Offered by the prosecution to rebut evidence adduced by the defendant under subdivision (a)." (Evid. Code, § 1102.)

At trial, Moore wanted to introduce specific instances of conduct, namely the certificate and awards he achieved postarrest. He argues this evidence would show that he acted consistent with his good character on the date of incident. In other words, the evidence would show that he was not a gang member. However, evidence of specific

22

instances of conduct is not admissible as character evidence under Evidence Code section 1102, subdivision (a). (*Felix*, *supra*, 70 Cal.App.4th at p. 431.)

In his reply brief, citing *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*) and *Felix*, Moore argues that the certificates and awards were evidence of his course of conduct and thus admissible as character evidence. His reliance on *McAlpin* and *Felix* is misplaced.

In *McAlpin*, the defendant was charged with child molestation. Our high court noted that it would be appropriate for two third party witnesses to testify that in their opinion, the defendant's behavior with their daughters was normal (i.e., he had normal sexual tastes) based on their observations of the defendant with their children. (*McAlpin, supra*, 53 Cal.3d at pp. 1309-1310.)

In *Felix*, the court determined that a witness could offer her opinion that the defendant only used heroin based on her observation of the defendant ingesting heroin. (*Felix, supra,* 70 Cal.App.4th at p. 430.)

Unlike the witnesses in *McAlpin* and *Felix*, the trial court here did not exclude opinion testimony from a third party witness as to Moore's character based on what that witness observed. Instead, Moore wanted to testify himself about some of his accomplishments. Such testimony is not admissible as character evidence under *McAlpin* or *Felix*.

Here, we are satisfied that the trial court did not abuse its discretion in excluding evidence of some of Moore's postarrest accomplishments. The fact that the trial court in Moore's first trial came to the opposite decision does not change our conclusion. We

respect this sometimes divergent exercise of discretion. The abuse of discretion standard requires us to uphold a ruling, which a reasonable judge might have made, even though we would not have ruled the same and a contrary ruling would also be sustainable. We cannot substitute our own judgment for that of another court. (*People v. Woods* (1993) 12 Cal.App.4th 1139, 1153.) Under the abuse of discretion standard, a trial court's ruling, even if it is diametrically opposed to a ruling on the same issue in a different proceeding or court, will be accorded the same level of deferential scrutiny on appeal. We thus will conclude a court abused its discretion only if the trial court's ruling exceeds the bounds of reason, all of the circumstances being considered. (See *People v. Giminez* (1975) 14 Cal.3d 68, 72.) On the record before us, we are satisfied that the trial court in Moore's second trial appropriately exercised its discretion.[4]

### DISPOSITION

The judgment is affirmed.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

BENKE, J.

---

[4] Because we conclude the trial court did not abuse its discretion in excluding the evidence of Moore's postarrest awards and certificates, we do not address any of Moore's claims of constitutional violations in regard to the exclusion of the evidence.

24